**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 20-CR-0006 (KBJ)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **STEVE CHOI,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through undersigned counsel, hereby respectfully submits its memorandum in aid of the sentencing of the defendant, Steve Choi, scheduled for October 8, 2020. The Government requests that the Court sentence the defendant to a term of incarceration within the 46 to 57 months Sentencing Guidelines range.

**I.     PRELIMINARY STATEMENT**

The defendant Steve Choi controlled a government contracting empire, and used that empire to pocket millions of dollars of taxes owed to the United States. The defendant operated numerous companies that provided food services within federal government buildings, including at the Department of Justice, the Department of Agriculture, the Department of Energy, the Department of Commerce, NASA, and the Library of Congress, among other locations. From 2012 to 2015, he directed his businesses to wrongfully keep $4,461,415 in employment taxes—including over $1.5 million withheld from employee paychecks—owed to the Internal Revenue Service ("IRS"). He further had his companies pocket $6,285,955 in sales taxes collected from customers that were owed to the District of Columbia Office of Tax and Revenue ("OTR"). The combined tax loss is a stunning $10,747,370. The tax liabilities accrued month after month and quarter after quarter with the defendant's knowledge and at his direction.

At the same time that the defendant's businesses were misappropriating millions in employment and sales taxes, he paid little-to-no individual income taxes and lived a luxurious lifestyle funded by the businesses. He paid himself hundreds of thousands of dollars in salaries and took over $1 million in distributions. He paid another million dollars in business funds towards his home mortgage, and hundreds of thousands more on college tuition. In total, he spent more than $4 million of what-should-have-been taxpayer money on himself and personal payments.

As a result of the defendant's appalling and protracted use of his government-contracting businesses to misappropriate millions of dollars in taxes to fund his personal lifestyle, the Government recommends a sentence within the Guidelines range of 46 to 57 months, followed by a period of supervised release, and payment of the agreed-upon restitution to the IRS.

## II.   STATEMENT OF FACTS

### A.  Procedural Background

On February 7, 2020, Choi waived indictment and pleaded guilty to a single count of willfully failing to pay employment taxes, in violation of 26 U.S.C. § 7202. (ECF #10) (Plea Agreement). As part of his plea, Choi acknowledged that he was a "responsible person," that is he had the corporate responsibility to collect, truthfully account for, and pay over payroll taxes. He also admitted to exercising control over the businesses' affairs, including hiring and firing employees, directing employees in their work duties, approving payments, and making financial decisions, and he acknowledged knowing about the businesses' tax liabilities by no later than 2011. Finally, the defendant admitted to the full tax loss attributable to his conduct, and agreed to pay restitution to the IRS and the D.C. Office of Tax and Revenue in the total amount of $11,394,336.09. (ECF #11) (Statement of the Offense).

B.     **Factual Background**

  i.     ***The Defendant Controlled a Multi-Million-Dollar Government Contracting Business Empire***

The defendant served as Chief Executive Officer of IL Creation of Maryland, Inc. ("ILC") from 1999 until 2020. (PSR ¶ 60). ILC bid on contracts for cafeteria and catering services in federal buildings in the Washington D.C. area. When the business won a bid for a contract, the defendant would typically create a separate business entity to operate that cafeteria's location.[1] As a result, over the years, the defendant created and operated thirteen entities. (PSR ¶ 61). These entities ran cafeterias and provided catering services to numerous federal departments and agencies across Washington D.C.

According to the defendant, his wife was the 100% owner of ILC. (PSR ¶ 60). In pitch materials to the government, Choi described ILC as an "American, women, minority, and locally owned Company." (Ex. 1) (ILC Letter to GAO).[2] At least one employee stated that the defendant's wife may have been listed as the nominal owner because the business's chances of obtaining government contracts increased by having a woman listed as the owner, and several employees stated that she had little to no involvement in the business. (*See, e.g.*, Ex. 2 ¶ 24) (JK MOI). Regardless, it is undisputed that the defendant was the "founder, President, and operator" of the ILC related businesses, and a "responsible person" obligated to collect and pay employment taxes. (ECF #11 ¶ 3, 5) (Statement of the Offense).

---

[1] These businesses were collectively referred in the Statement of the Offense (ECF #11) as "the Entities."

[2] The government is filing the exhibits cited in this memorandum under seal, along with a motion to seal, because the government's sentencing exhibits contain confidential taxpayer information, personal identifying information, and other sensitive witness information of such a nature and volume as to make redaction impracticable.

ii.     ***The Defendant Used His Government Contracting Empire to Pocket Millions of Dollars in Taxes Collected from His Employees' Paychecks***

Beginning in 2010, the defendant stopped paying employment and other withholding taxes due from his business ILC. The IRS initiated collection activities, and as early as March 2011, the defendant and other senior employees of ILC were interviewed by an IRS Revenue Officer, advised of the accruing tax liability and amounts, and explicitly told to pay the employment taxes in full. (Ex. 3 ¶ 17k) (SM MOI). After months of correspondence, IRS appeals, and reviews, in April 2013, the IRS approved an installment agreement for ILC to pay more than $1.5 million in taxes owed. (*See* Ex. 3 ¶ 17) (SM MOI). He not only defaulted on this agreement to pay back-taxes, he continued to not pay taxes going forward. (*See* Ex. 4 at 3) (ILC ICS History Excerpts). He collected from his employees—but did not pay over—nearly $350,000 in employment and trust fund taxes for ILC due in the latter half of 2013 alone. (ECF #11 at 4) (Statement of the Offense). In January 2014, another IRS Revenue Officer contacted Choi's power-of-attorney to discuss ILC's ongoing tax non-compliance. The defendant's power of attorney was explicitly told that the company had defaulted on its installment agreement, not filed a tax return in three quarters, and not paid taxes in nearly six months. (Ex. 4 at 3) (ILC ICS History Excerpts). This pattern— falling behind on tax payments, being advised by the IRS of the liability and their collection efforts, negotiating an agreement to pay the taxes back, and then defaulting on the agreement—was repeated over and over for the defendant's other food-service businesses.

In 2013, a second IRS Revenue Officer repeatedly communicated with the defendant and another senior employee of his businesses about the accruing employment tax liability for the NASA cafeteria, operated by ILC Green, Inc. In June 2013, after acknowledging his financial authority over the company and admitting that he had paid other expenses rather than his tax

obligations—which the law very clearly does not allow a taxpayer to do[3]—the defendant requested

that the business be put on a payment plan. (Ex. 5 at 16) (ILC Green ICS History Excerpts). Yet

the NASA cafeteria also went on to accrue over $240,000 in delinquent employment tax owed in

2015 alone. (ECF #11 at 5) (Statement of the Offense).

   As iterations of this pattern played out repeatedly from 2012 through 2015, all that truly

changed was the claimed rationale for failing to pay over taxes collected from the employees'

paychecks. One Revenue Officer was told that the non-compliance was due to the "government

shutdowns and government snow days," another that "there has been little to no profit due to the

lack of employees using the cafeteria," another that there were simply "no funds," and yet another

paradoxically told that the business "was losing money and was expanding at the same time." (Ex.

5 at 18, 11, 25, 22) (ILC ICS History Excerpts).

   In addition to being directly, repeatedly, and personally told of these unpaid tax obligations

by the IRS, the defendant was also repeatedly warned by the businesses' myriad bookkeepers and

comptroller. ILC alone employed as many as eight employees responsible for accounting

processes. (Ex. 6) (Accounting Process Org. Chart). Employees in the accounting department

communicated directly with the defendant, who was described by one accounting employee as a

micro-manager and aware of all aspects of the business. (Ex. 2 ¶ 28) (JK Moi). This financial

department operated at his direction and kept him well apprised of the companies' financial health

and accruing tax liabilities. One accounting employee was directed to compile and then update a

list of all of the companies' employment tax liabilities, which she provided to the defendant. (Ex.

---

[3] An employer is not entitled to pay wages, satisfy debts to other creditors, or to make personal expenses in lieu of remitting employment taxes to the United States. *See, e.g.*, *United States v. Boccone*, 556 Fed. App'x. 215, 238-39 (4th Cir. 2014) (affirming § 7202 convictions and finding "[t]he intentional preference of other creditors over the United States is sufficient to establish" that the crime was willful).

7 ¶ 33-34, 44) (SC MOI). One such summary showed over $2 million in employment tax liabilities as of the beginning of 2014. (Ex. 8) (Internal Summary of Outstanding Payroll Tax Liabilities).

By 2015, the defendant's employment tax scheme extended across eight different entities and 57 quarters of tax returns, and exceeded $4.4 million:

| Entity | Delinquent Employer and Trust Fund Taxes | Quarters with Delinquent Taxes |
|---|---|---|
| IL Creation of Maryland | $813,047 | 4 |
| JAC-USDA, Inc. | $1,368,254 | 10 |
| IGLC-LOC, Inc. | $1,129,960 | 14 |
| ILCC, Inc. | $446,745 | 6 |
| IL Creation the Market Place Inc. | $324,529 | 12 |
| ILC Green, Inc. | $258,554 | 5 |
| Market Place Parklawn, Inc. | $84,414 | 4 |
| IL Creation, Inc. | $35,911 | 2 |
| **TOTAL** | **$4,461,415** | **57** |

(*See* ECF #11 at 4-5) (Statement of the Offense).

Despite being repeatedly apprised of the growing tax liabilities, the defendant only stopped pocketing employment taxes beginning in 2016, after the D.C. Office of Tax and Revenue had initiated additional collection activity regarding sales taxes. Thereafter, the defendant began paying employment taxes as they became due for each succeeding quarter. However, the defendant made little effort to pay back the millions of dollars of employment taxes that his businesses had misappropriated. Of the total agreed-upon tax loss of $4,461,415, the defendant has subsequently paid back only $19,039, according to the IRS.

### iii.   *The Defendant Used His Government Contracting Empire to Pocket $6 Million in Sales Taxes Collected from His Customers*

At the same time the defendant was directing his businesses to wrongfully keep millions of dollars of employment taxes collected from employee paychecks, the defendant's businesses also misappropriated millions of dollars of sales taxes collected from cafeteria customers. Through his D.C. entities, he pocketed over $6 million in sales tax collected from customers and failed to

timely file no fewer than 333 sales tax returns for at least 14 different business locations from 2011 to 2015, as follows:

| Government Building or Location | Entity | Sales Taxes Misappropriated | Delinquent Sales Tax Returns |
|---|---|---|---|
| State Department | JAC-USDA | $831,851 | 19 |
| Library of Congress | ITLC-LOC | $768,058 | 42 |
| Coast Guard | IL Creation the Market Place | $726,436[4] | 52[5] |
| "An Uncommon Café" | IL Creations Inc. | $634,631 | 46 |
| Department of Agriculture | JAC-USDA | $586,856 | 19 |
| American Red Cross | ITLC-LOC | $567,817 | 40 |
| Department of Energy | IL Creation of Maryland | $278,584 | 12 |
| Department of Commerce | IL Creation of Maryland | $212,863 | 12 |
| "New World Café" | IL Creation of Washington DC | $129,318 | 14 |
| Executive Office Building | IL Creation of Maryland | $81,708 | 11 |
| Postal Square Building | IL Creation of Maryland | $74,775 | 11 |
| RFK Department of Justice Building | IL Creation of Maryland | $65,409 | 11 |
| New Executive Office Building | IL Creation of Maryland | $43,092 | 11 |
| One or More D.C. Locations | ILCC | $1,284,557[6] | 34[7] |
| **TOTAL** | -- | **$6,285,995** | **333** |

(See ECF #11 at 2) (Statement of the Offense).

This massive tax liability did not occur without the defendant's knowledge. Collection efforts began as early as 2011, when the D.C. Office of Tax and Revenue placed a lien on the defendant's business as a result of unpaid sales taxes. But the defendant successfully pleaded that it be removed from the business and made a personal lien so that it would not endanger his

---

[4] The business had an additional $45,961 in 2010 unpaid sales tax liabilities.

[5] The business had an additional three unfiled sales tax returns from 2010.

[6] The business had an additional $158,599 in 2010 unpaid sales tax liabilities.

[7] The business had an additional four delinquent sales tax returns from 2010.

government contracts, and the unpaid sales tax liabilities only continued to grow. (Ex. 9 at 6) (2012 Email Exchange re Lien).

This caused apprehension in the accounting department. At least one employee expressed concerns to the defendant that tax bills were not being paid, but the defendant told her that other uses of the money were more important than paying taxes. (Ex. 10 ¶ 31-32) (GK MOI). This employee also expressed ethical concerns to the defendant that the business had money but was not paying its taxes, and as a result asked to be transferred out of the accounting department, and ultimately left the business. (Ex. 10 ¶ 39) (GK MOI). The defendant late-filed hundreds of sales tax returns in June 2015, but to date has paid back only around $100,000 of the more than $6 million in agreed-upon sales tax loss, according to the D.C. Office of Tax and Revenue.

### iv.   *The Defendant Used Millions of Dollars in Employment and Sales Taxes to Fund His Luxurious Lifestyle, and for Years Paid No Individual Income Taxes*

During the time his businesses were pocketing millions in employment and sales taxes and in the years immediately thereafter, the defendant took lavish personal payments from his businesses. (*See* Ex. 11) (Summary of Personal Payments). From 2012 to 2018, the defendant made non-payroll transfers to his personal bank accounts of over $1.1 million, in addition to collecting salary of more than $448,000. He made $1.2 million in payments on his home mortgage from business accounts. The defendant paid over $207,000 toward his children's college tuition and expenses out of his business bank accounts. The defendant used business funds to purchase hundreds of thousands of dollars in luxury and personal goods. He made over $100,000 in payments on luxury cars from Mercedes Benz and BMW. He spent $50,000 on Celebrity Cruises. He used company money to make tens of thousands of dollars of other personal expenditures, including spending in excess $9,000 at Chanel, $9,000 at Neiman-Marcus, $6,000 at Tumi Stores, $4,000 at Giorgio Armani, and $3,000 at a day spa. The defendant also made payments to his

church of nearly $830,000 out of business bank accounts. In total, from 2012-2018, the defendant made over $4 million in transfers and payments from business bank accounts to pay his salary and to make other personal payments. (*See* Ex. 11) (Summary of Personal Payments).

During many of the years the defendant was living a lavish lifestyle supported by the embezzlement of millions in payroll and sales taxes, he was reporting net losses from his businesses on his individual income tax returns and paying no individual income taxes. For each of tax years 2013-2015, he reported no taxable income, as a result of claiming business losses and deductions of over $1.1 million. (Ex. 12) (2013-2015 Choi Tax Return Excerpts). He reported and paid no federal income taxes for those years, and in 2015, he even requested and received a federal tax refund of over $30,000. (Ex. 12 at 8) (2013-2015 Choi Tax Return Excerpts). Even in 2016 and 2017, when the defendant reported owing substantial individual income taxes, he failed to pay the full amounts due, and now owes over $370,000 in taxes, interest, and penalties for those years. (Ex. 13) (2016-2017 Choi IRS Account Transcripts).

III.   **APPLICABLE LAW**

A. **Statutory Maximum Sentence**

On February 7, 2020, Choi pleaded guilty to a one-count Information, charging him with the willful failure to account for and pay employment taxes, in violation of 26 U.S.C. § 7202. Count One carriers a maximum sentence of 5 years' imprisonment, a maximum term of 3 years' supervised release, a maximum fine, pursuant to 18 U.S.C. § 3571(d), of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to the United States, and a mandatory $100 special assessment.

B. **Guideline Range**

The Sentencing Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). In other words, the applicable Guidelines range "will be a benchmark or point of reference or departure when considering a particular sentence to impose." *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

i. *Base Offense Level*

The United States Probation Office has prepared a Presentence Investigation Report ("PSR") with guidelines computations that are the same as the computations agreed upon by the parties in their plea agreement. (*See* PSR ¶¶ 19-28). In the plea agreement, the parties agreed that the employment tax loss caused by Choi's conduct from 2012 to 2015 was $4,461,414.98. (ECF #10 ¶ 5A) (Plea Agreement). The parties further agreed that from 2011 to 2015 that Choi caused $6,285,955.17 in sales tax losses to the District of Columbia for entities that he owned and controlled. (*Id.*) Finally, the parties agreed that the sales tax losses should count as relevant conduct for purposes of sentencing under section 1B1.3, 2T1.1, and 2T1.6 of the guidelines. (*Id.*) Accordingly, the total tax loss, including relevant conduct is $10,747,370.13, (*see id.*), which corresponds to a base offense level of 26 under U.S.S.G. § 2T1.6 and 2T4.1(K), as the tax loss is more than $9,500,000.

ii. *Acceptance of Responsibility*

The defendant has demonstrated acceptance of responsibility for his offenses, and is therefore eligible for a two-level downward adjustment in offense level pursuant to U.S.S.G. § 3E1.1(a). (*See* PSR ¶ 26). Since the offense level before any reduction for acceptance of responsibility is 16 or greater and the defendant timely pleaded guilty, he is eligible for an

additional one-level downward adjustment under U.S.S.G. § 3E.1(b). (*Id.* at ¶ 27). After applying a three-level reduction for acceptance of responsibility, the defendant's total offense level is 23. (*Id.* at ¶ 28); (*accord* ECF #10 ¶ 5B (Plea Agreement)).

### iii. *Criminal History Category*

According to the PSR, the defendant has a criminal history score of zero with corresponding criminal history category of I. (*See* PSR ¶ 31).

### iv. *Advisory Guideline Range*

A total offense level of 23 with a criminal history category I corresponds to a sentencing range of 46 to 57 months' imprisonment. (*See* PSR ¶ 96); (ECF #10 ¶ 5D) (Plea Agreement). The advisory Guidelines fine range is $20,000 to $200,000. U.S.S.G. § 5E1.2(c)(3); (*see* PSR ¶ 112).

### C. The 18 U.S.C. § 3553(a) Sentencing Factors

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing

disparities; and (7) "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a).

### D.  Sentencing Recommendation

For years, Choi hindered IRS collection efforts and used his business empire to commit a massive employment and sales tax scam. A sentence that includes a 46-57 months guidelines term of imprisonment would reflect the seriousness of these crimes and serve to deter Choi and others from repeating the same conduct.

#### i.  *The Nature and Circumstances of the Defendant's Offense Requires a Significant Sentence*

The clearest scope of the defendant's tax crimes are the staggering loss figures. From 2011 to 2015, the defendant directed his companies to misappropriate more than $4 million owed to the IRS, and more than $6 million to the D.C. Office of Tax and Revenue. As the sentencing commission recognized, the dollar amounts involved in a particular tax crime provide an important measure of the seriousness of the offense—both in terms of the defendant's culpability and the need for deterrence. Thus, the Commentary to Section 2T1.1 states:

> Tax offenses, in and of themselves, are serious offenses; however, a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one with otherwise similar characteristics. Furthermore, as the potential benefit from the offense increases, the sanction necessary to deter also increases.

U.S.S.G. § 2T1.1, cmt. Backg'd. A substantial sanction is necessary to address and deter a tax scam that resulted in over $10 million in losses. To put this figure in context, according to the U.S. Sentencing Commission, in 2017, the median tax loss in criminal tax sentencings was

$277,576, and 87.2% of tax offenses involved tax losses of less than $1.5 million.[8] The loss figures here are more than *36 times higher* than those in a median tax case.

The extensive scam is further aggravated by the *type* of taxes that were stolen and the *manner* in which they were stolen. Every tax crime is a theft from every other citizen of this nation. Employment tax crimes, however, are also a violation of the employers' duties to their employees. Employment taxes are commonly referred as "trust fund taxes." These include Social Security, Medicare, and income taxes. The employer is supposed to collect the taxes on the employee's behalf, hold those taxes *in trust*, and then remit the money to the Treasury. Here, Choi collected the taxes from his workers but never remitted them. Instead, he embezzled the taxes as a revenue stream to pay for personal expenses and a luxury lifestyle. Similarly, customers who entrusted the defendant by paying sales taxes at his businesses were taken advantage of when he embezzled those tax payments for the benefit of his businesses.

His crime is all the more appalling because of the nature and location of the defendant's businesses. His companies provided food for government workers in federal buildings in the District of Columbia. He even operated a cafeteria at the Department of Justice. The defendant was running a multi-million-dollar business for federal entities and federal-employee customers. The defendant profited from these federal entities while simultaneously wrongfully taking the tax revenue necessary to fund such entities' existence.

The defendant's theft of more than $10 million was not a one-time mistake or a fleeting lapse in judgment. Employment taxes are collected and paid over quarterly. As such, it is not an obligation that is ever far from an employers' mind. He was reminded *every three months* of his

---

[8]     *See* "Quick     Fact     Tax     Fraud     Offense,"     available     at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY17.pdf.

obligation to file a return and pay the Treasury for *each* of his eight companies—this equates to 128 tax returns from 2012 to 2015—and yet, he repeatedly violated this basic responsibility. The same is even more true of the sales tax filings, which were required to be filed on a monthly basis, which the companies failed to do on 333 occasions. He applied this wholesale misappropriation of taxes across his businesses, thereby establishing a competitive advantage over tax-compliant companies. This was not an oversight but, at the defendant's direction, a fundamental part of the companies' core business strategy.

The defendant's knowledge of his tax obligations is clear. His umbrella company had a full accounting department, which employed multiple bookkeepers and accountants from 2011 to 2015. The defendant has admitted that he was frequently apprised between 2011 and 2015 of his payroll tax responsibilities, by both employees and the IRS. (PSR ¶ 12); (ECF #11 ¶ 6) (Statement of the Offense). The IRS similarly advised Choi, in writing and in person meetings, of his employment tax obligations and his accruing employment tax liabilities.

Notwithstanding this steady drumbeat of warnings, when confronted by the IRS and its collection and lien efforts, the defendant continued his scheme. He provided the Revenue Officers with a variety of excuses, promised to reform, entered into payment plans to stop collection activity, and then reneged after the threat of IRS liens and other enforcement action had been withdrawn. The employment tax liabilities, thus, continued to accrue and the old liabilities were never paid off. This rope-a-dope interaction with the IRS happened time and again with many businesses that the defendant controlled. These actions were not impulsive or desperate, but highly calculated and planned. The scheme is also astonishing in the amounts the government will likely never recover. This is demonstrated, in part, by the simple fact that

although the delinquent employment tax liabilities stopped accruing in 2015, the defendant has only paid $19,000 of the agreed-upon criminal employment tax conduct of over $4.4 million.

While the discussion above focuses predominantly on the defendant's employment tax scheme, the same arguments apply to the sales tax scheme, which was even more extensive and egregious. From 2011 to 2015, contemporaneous with the employment tax fraud, the defendant collected but failed to pay over more than $6 million in sales taxes to the District of Columbia's Office of Tax and Revenue. The scam was systemic. D.C. sales tax returns are due monthly. From 2011 to 2015, the defendant businesses failed to timely file 333 sales tax returns. During the same period, Choi failed to remit sales taxes for numerous companies with total loss amounts by company ranging from approximately $40,000 up to $1.2 million. As this pattern again reveals, widespread tax cheating, whether of the employment or sales tax variety, was a core feature of Choi's business operations.

As detailed in the facts section above, from 2012-2018, the defendant received over $4 million in transfers and payments from business bank accounts. These funds included a substantial personal salary and non-payroll checks, which together totaled more than $1.5 million from 2012 to 2018. This is in addition to the hundreds of thousands of dollars in corporate payments made towards his million-dollar homes, his children's' education expenses, and his luxury car and personal expenditures. The defendant's crime was not necessary to keep his businesses afloat, but was a choice to live extravagantly at the taxpayers' expense.

Ultimately, the harms and consequences of the defendant's multi-year scam are substantial. He defrauded the United States and the District of Columbia out of more than $10 million. More broadly, he injured the United States' tax system, which relies on its businesses and taxpayers to report timely, completely, and honestly all taxes they owe, from whatever source

derived. The defendant failed to do that here at the expense of the honest and hardworking taxpayers who work and pay their fair share of taxes as the law requires. Such prolonged and serious criminal conduct warrants a significant term of incarceration.

ii. ***The Defendant's History and Characteristics Provide No Excuse for His Actions***

The defendant, through his familial support and higher education, had more advantages than most defendants who appear before this Court. At the time that he perpetrated his scheme, he was the owner and manager of multiple successful food service companies. He had a privileged position and already controlled significant wealth and assets, including two homes now worth collectively more than $2.7 million. (*See* PSR ¶ 77). Thus, by the time the defendant began committing his crimes, he had success and wealth of which most law-abiding Americans can only dream. He had no need to embezzle taxes with which he had been entrusted. But he chose to do so. This weighs in favor of a guidelines sentence.

iii. ***The Need to Promote Respect for the Law and to Afford Adequate Deterrence***

Criminal tax prosecutions serve not only to punish the violators, but also to promote general deterrence and encourage all taxpayers to abide by the rules and pay their fair share of taxes. General deterrence is one of the critical means of reducing the amount of money lost each year through tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect."). Accordingly, the Sentencing Guidelines clearly articulate that deterrence should be a primary consideration when sentencing defendants for tax crimes. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from disobeying the tax laws is of the utmost importance when

punishing criminal tax violations. *See* U.S.S.G. § 2T1, introductory cmt. (2016). Deterrence is particularly crucial in a case such as this with a serial tax offender who essentially performed a cost-benefit analysis and consciously and willfully violated the tax laws. "Defendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). The sentence imposed in this case should put other would-be tax cheats on notice that a substantial term of imprisonment is a reality for those who willfully violate the internal revenue laws. *See United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006) ("The goal of deterrence rings hollow if a prison sentence is not imposed.").

The sentence should also assure law-abiding taxpayers that they are making the right choice by filing tax returns and paying their share of taxes. *United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it"). Our tax system depends on such voluntary compliance of honest taxpayers. Here, a significant sentence of imprisonment will certainly deter others and send a message that cheating on your taxes and stealing millions from the IRS bears very serious consequences. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

> iv.  ***The Sentencing Guidelines Are a Means to Avoid Unwarranted Sentencing Disparities***

The Sentencing Guidelines reflect the consensus that even first-time-offenders convicted of economic crimes should be subject to incarceration. The legislative history of the Sentencing

Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished. *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then-Judge Breyer—who was an original member of the Sentencing Commission—explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 20-21 (1988).

The Guideline range reflects the seriousness of the offense, promotes respect for law, and provides for just punishment in this case. The Government's recommendation of a sentence within the guideline range for the defendant is based, in part, on the fact that such a sentence properly reflects the considered policy of the Sentencing Commission. Anchoring the sentence to the Guideline range also serves to reinforce uniformity and fairness in sentencing. Nevertheless, it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (internal quotation marks omitted). Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might

achieve § 3553(a)'s objectives." *Id.* at 109 (internal quotation marks omitted). Such is the case here.

E. **Order of Restitution**

The government currently calculates the correct amount of restitution to be ordered in this case as $4,884,782.19[9] payable to the IRS, and $6,390,182.69[10] to the District of Columbia Office of Tax and Revenue. The Government will inform the Court of the status of any further payments made by the defendant on this agreed-upon restitution prior to sentencing.

---

[9] This figure represents the agreed-upon employment tax restitution in the plea agreement of $4,903,820.93, less $19,038.74 in payments by the defendant.

[10] This figure represents the agreed-upon sales tax loss in the plea agreement of $6,490,515.16, less $100,332.47 in payments by the defendant.

## **CONCLUSION**

The defendant made a deliberate choice to violate the trust bestowed upon him as an employer and to take advantage of the federal tax system for personal profit. Over a four-year period, he defrauded the United States and the District of Columbia of more than $10 million. This is a serious crime that deserves a serious sentence. For the aforementioned reasons, the Government respectfully recommends that this Court sentence the defendant to a term within the 46 to 57 month Sentencing Guidelines range, a three-year term of supervised release, a mandatory fee assessment of $200, and restitution payable to the IRS in the amount of $4,884,782.19 and to the D.C. Office of Tax and Revenue in the amount of $6,390,182.69.

DATED:          September 24, 2020

Respectfully Submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia

By:     /s/_____
        Jack Morgan, Trial Attorney
        Jack.A.Morgan@usdoj.gov
        202-598-7036
        Eric Schmale, Trial Attorney
        Eric.C.Schmale@tax.USDOJ.gov
        (202) 514-5614
        Veronica Sanchez, AUSA
        VSanchez@usa.doj.gov
        202-252-7518
        Department of Justice Tax Division
        150 M Street NE
        Room 1.116
        Washington, DC 20002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 20-CR-0006 (KBJ)** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **STEVE CHOI** | : | |
| **Defendant.** | : | |

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

By:     /s/ Eric Schmale
Jack Morgan, Trial Attorney
Jack.A.Morgan@usdoj.gov
202-353-7580
Eric Schmale, Trial Attorney
Eric.C.Schmale@tax.USDOJ.gov
(202) 514-5614
Veronica Sanchez, AUSA
VSanchez@usa.doj.gov
202-252-7518
Department of Justice Tax Division
150 M Street NE
Room 1.116
Washington, DC 20002