# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Case No. 1:20-cr-00006 (KBJ)** |
| **STEVE CHOI** | * | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

September 24, 2020

Caroline D. Ciraolo
Bar No. 453882
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW
Suite 260
Washington, D.C. 20001
cciraolo@kflaw.com
Phone: (443) 845-4898
Facsimile: (212) 808-8108
*Counsel for Steve Choi*

i

## **TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................................iii

PRELIMINARY STATEMENT....................................................................................................1

PROCEDURAL BACKGROUND.................................................................................................4

MR. CHOI'S HISTORY AND CHARACTER ............................................................................4

a. Mr. Choi's Personal and Family History ..............................................................................4

b. Mr. Choi and I.L. Creations ..................................................................................................7

c. Mr. Choi's Devotion to His Family .......................................................................................8

d. Mr. Choi's Charitable Work & Involvement in the Church ...............................................11

e. Mr. Choi's Advocacy & Mentorship in Korean-American Community ............................14

f. Mr. Choi's Medical History & Diagnoses ..........................................................................17

THE ADVISORY GUIDELINE CALCULATION ...................................................................17

APPLICABLE LAW ...................................................................................................................18

A Downward Variance Is Warranted ..........................................................................................19

    1) The Nature of the Offense................................................................................................19

    2) The History and Characteristics of the Defendant ...........................................................20

    3) The Purpose of Sentencing ...............................................................................................25

    4) The Kinds of Sentences Available ....................................................................................30

    5) The Guidelines ..................................................................................................................38

    6) Pertinent Policy Statements of the Sentencing Commission ............................................39

    7) The Need to Avoid Unwarranted Disparities Among Similar Offenders ..........................40

THE IMPACT OF COVID-19.....................................................................................................44

CONCLUSION.............................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Banks v. Booth*, No. 20-cv-849 (CKK), 2020 WL 1914896 (D.D.C. Apr. 19, 2020) .................................. 46

*Banks v. Booth*, No. 20-cv-849 (CKK), 2020 WL 3303006 (D.D.C. June 18, 2020) .................................. 47

*Cunningham v. California*, 549 U.S. 270 (2007) ...................................................................................... 18

*Doe v. Barr*, No. 20-cv-02141 (LB), 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) ........................... 48, 49

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................................................ passim

*Koon v. United States*, 518 U.S. 81 (1996) .............................................................................................. 18

*Rita v. United States*, 551 U.S. 338 (2007) ............................................................................................. 18

*Rodriguez v. United States,* 111 F. Supp. 2d 112 (D. Conn. 1999) ........................................................... 31

*Torres v. Milusnic*, No. 20-cv-4450 (CBM), 2020 WL 4197285 (C.D. Cal. July 14, 2020) ...................... 47

*United States v. Accardi*, 669 F.3d 340 (D.C. Cir. 2012) ........................................................................ 33

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................................. 20, 21, 38

*United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) ............................................................................... 22

*United States v. Bikundi*, No. 14-cr-30-2 (BAH), 2020 WL 3129018 (D.D.C. June 12, 2020) ............ 27, 29

*United States v. Booker*, 543 U.S. 220 (2005) .................................................................................... 18, 22

*United States v. Burks*, 2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010) ...................................................... 22

*United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) ............................................................................ 21

*United States v. Courtney,* 76 F. Supp. 3d 1267 (D.N.M. 2014) .............................................................. 28

*United States v. Croft*, No. 95-496-1 (JRP), 2020 WL 3871313 (E.D. Pa. July 9, 2020) .......................... 44

*United States v. D'Oliveira,* 402 F.3d 130 (2d Cir. 2005) ........................................................................ 31

*United States v. Day*, No. 6:18-CR-06015 EAW, 2020 WL 4196357 (W.D.N.Y. July 21, 2020) ............. 44

*United States v. DeBartolo*, No. 14-cr-016 (WES), 2020 WL 3105032 (D.R.I. June 11, 2020) ................ 44

*United States v. Del Campo*, 695 F. App'x 453 (11th Cir. 2017) .............................................................. 28

*United States v. Dozier*, 119 F.3d 239 (3d Cir. 1997) .............................................................................. 32

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ........................................................................ 27

*United States v. Fishman*, 631 F. Supp. 2d 399 (S.D.N.Y. 2009) .............................................................. 22

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) .......................................................................... 22

*United States v. Galaz*, No. 15-cr-02559 (GPC), 2020 WL 4569125 (C.D. Cal. Aug. 12, 2020) ............. 49

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) ................................................................... 27

*United States v. Gilchrist*, 130 F.3d 1131 (3d Cir. 1997) ........................................................................ 32

*United States v. Ginyard*, 215 F.3d 83 (D.C. Cir. 2000) .......................................................................... 32

*United States v. Herlihy*, No. CR 15-2218 (JB), 2020 WL 1033411 (D.N.M. Mar. 3, 2020) ................... 31

*United States v. Hodges*, No. 10-CR-624, 2014 WL 3695491 (E.D.N.Y. July 23, 2014) ........................30

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ...........................................................................20

*United States v. Jackson*, No. 19-cr-00492 (RA), 2020 WL 2759601 (S.D.N.Y. May 26, 2020) ..............50

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) .........................................................................22

*United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 WL 3041923 (D.D.C. May 16, 2020) .............46, 49

*United States v. K*, 160 F. Supp. 2d 421 (E.D.N.Y. 2001).......................................................................23

*United States v. Mallatt*, No. 4:13CR3005, 2013 WL 6196946 (D. Neb. Nov. 27, 2013) ........................32

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008).............................................................................50

*United States v. Mathis-Gardner*, 110 F. Supp. 3d 91 (D.D.C. 2015).....................................................33

*United States v. Moore, 344 Fed. App'x. 767 (3d Cir. 1990)* .................................................................25

*United States v. Mousseau*, 599 F. App'x 726 (9th Cir. 2015)................................................................29

*United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ......................................................23, 30

*United States v. Parris*, 753 F. Supp. 2d 744 (E.D.N.Y. 2008) ...............................................................38

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ..........................................................................29

*United States v. Powell*, No. 05-cr-0061 (ESH), 2020 WL 4578682 (D.D.C. June 18, 2020) ..................48

*United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307 (D. Mass. Mar. 26, 2020) .............46

*United States v. Rock*, 863 F.3d 827 (D.C. Cir. 2017) ...........................................................................32

*United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020)........46

*United States v. Rodriguez*, No. 3:17-cr-4477 (BTM), 2020 WL 4592833 (S.D. Cal. Aug. 5, 2020)........48

*United States v. Skelos*, No. 15-cr-317 (KMW), 2020 WL 1847558 (S.D.N.Y. Apr. 12, 2020)................45

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ...........................................................................29

*United States v. Sullivan*, 451 F.3d 884 (D.C. Cir. 2006).......................................................................33

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) .........................................................................20

*United States v. Tomko,* 562 F.3d 558 (3d Cir. 2009)............................................................................21

*United States v. Warner*, 792 F.3d 847 (7th Cir. 2015) ....................................................................21, 29

*United States v. Wilson*, 503 U.S. 329 (1992)......................................................................................32

*United States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020)...........45, 50

*Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020) ................................................................................47

## Sentencings

*United States v. Betancourt*, No. 19-20684-cr-MGC (S.D. Fla. Mar. 11, 2020) .......................................42

*United States v. Gazdick*, No. 19-cr-00200 (E.D. Va. Nov. 8, 2019) .......................................................41

*United States v. Paper,* No. 8:13-cr-00599-RWT (D. Md. Mar. 11, 2014) ...............................................42

*United States v. Pursley*, No. 4:18-CR-575 (S.D. Tex. Aug. 12, 2020).....................................................41

*United States v. Revell*, No. 13-cr-00317 (KBJ) (D.D.C. Mar. 25, 2014) ..................................................43

*United States v. Shamilzadeh,* No. 04-1094 (JG) (E.D.N.Y., Apr. 1, 2008) ..............................................36

*United States v. Sickle,* No. 17-cr-00073 (KBJ) (D.D.C. Aug. 1, 2017) ....................................................43

*United States v. Venuti,* No. 10-00235-WMN (D. Md., Nov. 2, 2010) ................................................38, 42

*United States v. Warner,* No. 1:13-cr-00731 (CPK) (N.D. Ill. Jan. 14, 2014)........................................36, 37

**Statutes**

18 U.S.C. § 3551 ..............................................................................................................................................30

18 U.S.C. § 3553 .......................................................................................................................................passim

18 U.S.C. § 3561 ..............................................................................................................................................30

18 U.S.C. § 3562 ..............................................................................................................................................30

18 U.S.C. § 3563 ..............................................................................................................................................30

18 U.S.C. § 3582 ..............................................................................................................................................26

18 U.S.C. § 3583 ................................................................................................................................30, 31, 33

18 U.S.C. § 3585 ..............................................................................................................................................32

26 U.S.C. § 7201 ..............................................................................................................................................21

26 U.S.C. § 7202 ..............................................................................................................................2, 4, 17, 42

26 U.S.C. § 7203 ......................................................................................................................................38, 43

26 U.S.C. § 7206 ..............................................................................................................................................42

28 U.S.C. § 991 ................................................................................................................................................40

**Sentencing Guidelines**

U.S.S.G § 5D1.3 ..............................................................................................................................................33

U.S.S.G. § 2T1.6 ..............................................................................................................................................17

U.S.S.G. § 2T4.1 ..............................................................................................................................................39

U.S.S.G. § 2T4.1K ...........................................................................................................................................17

U.S.S.G. § 3E1.1 ..............................................................................................................................................17

U.S.S.G. § 5D1.3 .......................................................................................................................................33, 34

U.S.S.G. § 5F1.2 ..............................................................................................................................................34

U.S.S.G. § 5Fl.2 ...............................................................................................................................................34

U.S.S.G. §5D1.1 ...............................................................................................................................................31

**Other Authorities**

Alan Ellis, John R. Steer, and Mark H. Allenbaugh, *At a "Loss" for Justice-Federal Sentencing for Economic Offenses,* 25 WTR Crim. Just. 34 (2011) ..............................................................................38

Alexandra Brewis & Amber Wutich, *COVID-19 Is Harming Mental Health in Prisons,* Psychology Today (June 2, 2020) ...........................................................................................................................48

Amy Woodyatt, *Experts Warn of Urgent Need for COVID-19 Mental Health Research*, CNN (Apr. 15, 2020) ........................................................................................................................................48

Brendan Saloner, et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, Journal of the American Medical Association, (July 8, 2020)..........................................................................44

Bureau of Prisons, *Sentence Computation Manual*, 1-15A ........................................................32

Christine Thompson & Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project (Nov. 21, 2018)..........................................................48

*Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service,* Office of Probation and Pretrial Services, Administrative Office of the U.S. Court, 2005 ......35

Darren Gowen, *Overview of the Federal Home Confinement Program*, 64 Fed. Probation, 1, 12 (Dec. 2000) ..........................................................................................................................................34

Dr. Liji Thomas, *Does Cholesterol Play a Role in COVID-19?,* News Medical (May 12, 2020).............48

Hao Wang et al., *The Role of High Cholesterol in Age-Related COVID19 Lethality*, (May 10, 2020)......48

Jamie Fellner, *Old Behind Bars: The Aging Prison Population in the United States*, Human Rights Watch (Jan. 27, 2012)..............................................................................................................................24

Joseph Neff & Beth Schwartzapfel, *Infected, Incarcerated – and Coming to an ICU Near You?*, The Marshall Project (Apr. 16, 2020) ................................................................................................46

Keri Blakinger & Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, The Marshall Project (June 18, 2020).........................................46

Lois Parshley, *The Emerging Long-Term Complications of COVID-19, Explained*, Vox (June 12, 2020)47

Michael Tonry, Intermediate Sanctions In Sentencing Guidelines, Nat'l Inst. of Justice (1997) ...............35

National Institute of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* (May 2016)...............28

Terry Carter, *The Judge Who Said No*, ABA Journal, Oct. 2013 .................................................19

U.S. Attorney General, *Memorandum to Director of Bureau of Prisons re Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020) .............................45

U.S. Dep't Just., Off. of the Inspector Gen., Report: *Top Management and Performance Challenges Facing the Department of Justice – 2019*, 4 (Oct. 18, 2019)..................................................46

U.S. Dep't of Justice, National Institute of Corrections, *Correctional HealthCare: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004)............................................24

U.S. Sentencing Comm'n, *2007 Annual Report* ..........................................................................40

U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics*...........23

U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines (May 3, 2010) .............................39

World Health Org., Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19) (Feb. 28, 2020)..............................................................................................................................49

## **PRELIMINARY STATEMENT**

Pursuant to 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines ("the Guidelines"), Defendant Steve Choi ("Mr. Choi" or "Steve") respectfully submits this Sentencing Memorandum and requests that the Court vary from the Guidelines and impose a sentence of time served and supervised release with conditions of home detention and a substantial, full-time community-based service program.  Such a sentence would both be punitive and have structured rehabilitation goals. The community-based service program would be either in-person or remote, as public health circumstances permit, with regular reports to the U.S. Probation Office.   In support of this proposed sentence, we respectfully request that the Court consider the following points.

First, we ask the Court to consider Mr. Choi's nearly 60 years in their entirety.  Mr. Choi accepts full and complete responsibility for his criminal conduct and hopes the Court will take into account his otherwise honorable and philanthropical life, much of which has been devoted to the care and assistance of others.  Mr. Choi is a devoted husband, father, and son, a business owner who has employed thousands, and a decades-long volunteer in his community.  He is well known and respected for giving back and providing for those who need assistance.  This is evident from the more than 100 letters written on his behalf by family, friends, congregants, current and former employees, and members of the community.

For example, Mr. Choi's sister-in-law Sunhee Choi Lee asks the Court to consider the many lives that Mr. Choi's compassion has reached—"the broken, struggling immigrants, suffering children, youth, elderly, the 'comfort women',[1] and most importantly, his two

---

[1] "Comfort women" is a euphemism for the thousands of Korean women forced into sexual slavery by the Japanese army during World War II.

1

daughters who have just now entered society carrying the same love for the world as their father." Ex. A at 238 (Ltr. of Sunhee Choi Lee); *see also* Ex. A at 95 (Ltr. of Jeong Hoan Lee) ("Because of his childhood experiences, [Mr. Choi] has become someone who shares his all with the immigrant community—providing job opportunities, selflessly pouring out his love to all within his surroundings."). Fellow church congregant and former employee, Kyong Hui Li, agrees:

> In my own experience I have witnessed Mr. Choi constantly going above and beyond for members in our community, and is always willing to help those in need. I have personally seen him volunteering and giving back to his community whenever he can. He is a selfless individual and is one of the most generous people I have met during my lifetime. Ex. A at 130 (Ltr. of Kyong Hui Li).

Many others echo this sentiment in their letters and offer numerous examples of Mr. Choi's extraordinary dedication to helping the less fortunate and giving back to his community.

Next, we ask the Court to consider that Mr. Choi comes before this Court having fully cooperated with the Government in its investigation and pleaded guilty to the willful failure to collect, truthfully account for, and pay over employment taxes in violation of 26 U.S.C. § 7202. In addition to the tax loss of the offense charged, Mr. Choi acknowledges and accepts full responsibility for all relevant conduct.  Significantly, at the end of 2015, Mr. Choi began working closely with his representatives and the tax authorities in an effort to address the tax problem and has been in compliance with his employment tax obligations since early 2016. While this does not eliminate his culpability for the prior years, it is an important factor to be considered in determining an appropriate sentence.

Moreover, in a continued effort to accept full responsibility for his conduct and make amends, Mr. Choi agreed to an order of restitution covering all federal and D.C. tax liabilities, including those that did not arise from his criminal conduct.  This provides the Government with additional tools to collect the amounts due following the criminal proceedings.

Mr. Choi has paid and continues to pay a very heavy price for his wrongful conduct. All his assets have been or are being liquidated with the proceeds going to the tax authorities, and any future income will be subject to collection. Mr. and Mrs. Choi have entered into a contract to sell the family home and, at closing, all net proceeds will be remitted to the Internal Revenue Service. He has lost the business he spent his life building and has been debarred from federal contracts.[2] He is ashamed and humiliated, and knows that as a result of his conduct, his family has and will continue to suffer and his community has lost a leader and mentor.

Finally, we ask the Court to consider Mr. Choi's age, health, and vulnerability to COVID-19. He turns 59 years old on November 10 and has significant health conditions, including high cholesterol and depression. Like so many others at his age and with his underlying conditions, he is particularly vulnerable to contracting and dying from COVID-19. As the Court is undoubtedly aware, the Bureau of Prisons ("BOP") now houses thousands of infected inmates and is simply unable to implement Centers for Disease Control and Prevention ("CDC") guidance regarding social distancing and sanitation. Further, the BOP's medical facilities are overwhelmed and cannot properly care for all its patients. As a result, the virus has spread uncontrollably throughout the federal prison system, leading to the deaths of dozens of vulnerable inmates. Mr. Choi accepts and anticipates an appropriate sentence for his crime but implores the Court to consider a sentence of time served and supervised release with home detention and substantial community service conditions in lieu of incarceration, which could amount to a death sentence.

---

[2] Ex. C at 1-2, U.S. Dep't of Comm., Notice of Debarment for Mr. Steve Choi (Sep. 9, 2020).

## PROCEDURAL BACKGROUND

On December 23, 2019, Mr. Choi entered into a plea agreement admitting to and accepting full responsibility for the willful failure to collect, truthfully account for, and pay over employment taxes in violation of 26 U.S.C. § 7202.  Following his initial appearance and guilty plea on February 7, 2020, the Court granted Mr. Choi release pending sentencing. Doc. [7].  Mr. Choi's sentencing date has been continued by the Court first to June 30 and then to October 8 due to the COVID-19 pandemic and its impact on the judicial system.  During this time, Mr. Choi has fully complied with all conditions of his release.

## MR. CHOI'S HISTORY AND CHARACTER

As Mr. Choi comes before this Court, friends, family, employees, community leaders, and beneficiaries of his good works have come forward to express their support and hope that the Court will show mercy in sentencing.  Through these sincere and heartfelt letters, a clear and compelling picture emerges. Of course, to truly understand Mr. Choi, we must start at the beginning.

### a. Mr. Choi's Personal and Family History

Steve Choi was born in 1962 in Seoul, South Korea. He is the second of four sons born to Charles and Ester Choi. Mr. Choi maintains a close relationship with his three brothers, Stanford (age 60), Bryan (age 53), and Kenneth (age 50). All the Choi children work in the food service industry. Stanford and Kenneth live in the Washington, D.C., metropolitan area and Bryan lives in Chicago. Mr. Choi's parents, Charles (age 83) and Ester (age 81,) are now retired and live in Ashburn, Virginia.

Mr. Choi and his family lived in South Korea until 1974, when they moved to the United States and settled in the Dumfries, Virginia.  Mr. Choi was 12 years old and unable to speak

4

English.  He was forced to quickly adapt to life in the United States.  His parents bought a local delicatessen and food market in Washington, D.C., and worked long hours to support their family. As soon as the boys were old enough, they helped in the family business. Mr. Choi began working when he was 13 years old.

In 1976, Mr. Choi's mother was robbed at gunpoint. This traumatic experience caused his father to sell the business and relocate to New York City, where the family moved in with a close relative. Charles and Ester bought a dry-cleaning store.  Once again, the children worked in the family business after school.

During this time, Mr. Choi discovered his passion for music and was accepted into the High School of Performing Arts, where he played violin. Unfortunately, in 1979, the dry-cleaning store burned down. Without insurance to rebuild, the Choi family made the difficult decision to return to the Maryland/D.C. area, where they settled in Columbia, Maryland. Ex. A at 19 (Ltr. of Charles Choi) ("Our dry cleaner business, our livelihood, was burnt up and gone with the blink of an eye one morning"); Ex. A at 94 (Ltr. of Jeong Hoan Lee) ("One day, his parents' dry cleaners burned to the ground. He witnessed the immense pain of his family's life earnings, their livelihood, disappearing with the fire. He witnessed the shadows on the face of his immigrant parents who lost everything.").[3]

Needing to support their family, Charles and Ester Choi returned to the food service industry, taking over a small carry-out restaurant in downtown Baltimore.  Mr. Choi's parents initially struggled to run the business on their own, so Mr. Choi left high school to work at the restaurant full-time. Eventually, he was able to return to Oakland Mills High School in

---

[3] Many of the character letters sent to this Court on behalf of Mr. Choi were written in Korean. We have provided informal translations along with the originals for the convenience of the Court.

Columbia, Maryland, where, while still working part-time shifts at the family restaurant, he earned his high school diploma.

In 1981, Mr. Choi was accepted into the University of Maryland, Baltimore County (UMBC).  Unfortunately, Mr. Choi found that similar difficulties awaited him in college. Although he loved his classes, Mr. Choi struggled to balance his educational responsibilities with his commitment to the family business.  His long hours at the restaurant took a toll on his academic performance.  After two years at UMBC, Mr. Choi again decided to interrupt his education to fulfill his familial responsibilities at the restaurant.

About a year later, Mr. Choi applied to and was accepted into Houghton College in Buffalo, New York. He traveled to New York at the start of each week to take classes, and then returned home each weekend to work in the restaurant all weekend. This also proved to be much too difficult, and Mr. Choi once again left school to work full-time at the restaurant.  Mr. Choi finally completed his undergraduate degree at the age of 47, when he earned a B.A. in Bible Studies from Virginia Christian College.

In 1989, Mr. Choi met his wife, Leena. They married the following year, and their first child, Christine, was born on August 3, 1991.  During this time, Mr. Choi worked long hours, and the restaurant expanded to multiple locations.  Mr. Choi's oldest brother, Stanford, who had been living in South Korea, returned to the United States to oversee daily operations. This allowed Mr. Choi, Leena, and Christine to spend about eight months with Leena's family in South Korea.

In 1992, Mr. Choi and Leena moved to Los Angeles, California, where they welcomed their second daughter, Eunice, on October 28, 1993.  With a new family of four to support, Mr. Choi began working as a freelance tour guide in Los Angeles. After learning about the travel

industry, he decided to open his own agency in South Korea, specializing in travel between South Korea and the United States. This caused Mr. Choi and his family to spend substantial time in South Korea, ultimately moving there in March 1994 to focus on the business.  In 1997, the South Korean financial market crashed, forcing Mr. Choi and Leena to make the difficult decision to close the travel agency and return to the United States. Ex. A at 95 (Ltr. of Jeong Hoan Lee) ("He had returned to the United States with empty hands following the financial crisis; and was just starting again from scratch.").

**b. Mr. Choi and I.L. Creations**

In 1999, an opportunity arose for Mr. Choi to use his experience in the food industry. The cafeteria located in the Coast Guard Headquarters in Washington, D.C., was privately owned and for sale. Mr. Choi did not have sufficient funds to pay the full purchase price but agreed to an installment sale over five years.  Following renovations, Mr. Choi opened operations and was soon increasing sales. The owner of the building was impressed, and in 2001 invited Mr. Choi to operate two cafeterias located within the Food & Drug Administration building at 5600 Fishers Lane in Rockville, Maryland.

In December 2001, Mr. Choi successfully bid to operate the cafeteria located in the Department of Commerce, and in 2007, he was awarded the contract to run the cafeteria in the White House. Mr. Choi continued to bid on various locations, ultimately operating dozens of locations and providing approximately 400 full-time and part-time positions with competitive salaries, benefits, and opportunities for growth within the company.

Prior to his resignation in early March 2020,[4] Mr. Choi was a generous and caring employer to the many employees working in I.L. Creations' cafes and offices. Ex. A at 238 (Ltr. of Sunhee Choi Lee) ("Every time I visited his workplace, I saw him treating all of his employees, no matter their age, race, gender, background, with the utmost respect and care."); Ex. A at 208 (Ltr. of Seonho Choi) ("Even when I saw him last year, he was showing me pictures of his employees and lovingly heaping praises upon them and the hard work they contribute to the company.").

Matthew Yoo, a vice president at I.L. Creations, recounts an incident when an employee stole a company check and cashed it. Ex. A at 147 (Ltr. of Matthew Yoo).  Instead of firing the employee and involving the police, Mr. Choi called the employee in and asked him why he had stolen the check.  The employee explained that he had done it to pay for his family's medical bills.  Mr. Choi allowed the employee to keep his job and repay the funds from future wages. Mr. Yoo recalls Mr. Choi's explanation: "Steve said he stepped into the employee's shoe and saw that he and his family were suffering and in need, and he was in a position to help so he did, simple as that." *Id*.

### c.  **Mr. Choi's Devotion to His Family**

Mr. Choi is a loving father, a faithful and devoted husband, and a loyal and dutiful son. In the words of his sister-in-law, Mr. Choi has "always lived a life that has centered around the well-being of his family." Ex. A at 220 (Ltr. of Soo Jung Choi).

Mr. Choi's father recalls that "[e]ver since he was young, his dreams and ambitions have been to help our family. To do so, he gave up his education and suffered tremendously to help us

---

[4] Ex. B, Steve Choi, Letter of Resignation (Feb. 28, 2020).

in our struggles." Ex. A at 19 (Ltr. of Charles Choi).  A close friend recounts that "his love for his mother was so special. To celebrate the 80th birthdate of his mother, he made the song by himself and sang a song to express his love for his mother in tears." Ex. A at 181 (Ltr. of Roy Joongyuk Im).  Now that Mr. Choi's parents are elderly and in poor health – his mother is suffering from both liver cirrhosis and dementia – Mr. Choi devotes substantial time to their care.  He visits them three-to-four times a week to prepare their meals, help around the house, and spend time addressing their medical issues. Since the outset of the COVID-19 pandemic, Mr. Choi and his wife have been his parents' primary caretakers.

Mr. Choi also plays an active role in the lives of his daughters.  Christine credits her father's teachings for who she is today. She recalls that from "[v]ery early on in my life, he taught me to respect and help others–I remember him making me put back unwanted groceries in their proper place as to not make more work for grocery store employees." Ex. A at 25 (Ltr. of Christine Choi). She also writes about how Mr. Choi expressed his fatherly love through acts of service:

> Another time, I had to attend a wedding in Pennsylvania. Though I could drive, my dad could not bear to have me drive alone, so he drove me to the wedding and waited outside until I was finished. Because I don't have a car, my dad has driven me to work, early in the morning, every day without fail.

*Id.* at 26.  Eunice describes how her father is "a protector, at the core of his character":

> Even now, at 26 years of age, he comments on the way I hold a knife when cutting vegetables because he fears I will hurt myself. He refuses to go to sleep and stays up until I am safe at home on nights that I may be out.

Ex. A at 44 (Ltr. Of Eunice Choi). Those outside the family describe Christine and Eunice as outstanding individuals who "have grown into such wonderful women who love and faithfully serve those in need." Ex. A at 238 (Ltr. of Sunhee Choi Lee).

9

In her letter to the Court, Mr. Choi's wife of 30 years, Leena, emphasizes her husband's "dutiful strength and love" for her and their daughters. Ex. A at 137 (Ltr. of Leena Prisca Choi at 2).  She also describes Mr. Choi as a dedicated partner: "my husband always handwrites the most thoughtful cards during special occasions–birthdays, anniversaries, Valentine's Day, Christmas, etc. I've been holding onto these precious pieces of his heart for the past 30 years, because I want to decorate the kitchen with all these memories for his 60th birthday." *Id*. at 138.

Mr. Choi's familial devotion extends beyond his immediate family.  Mr. Choi's sister-in-law, Jenna, describes that "[h]e is the favorite uncle to our two children whom he adores and gives his undivided attention when he is around them. His sympathetic and engaging personality is always able to bring out their best and draws out many smiles even from my introverted son." Ex. A at 92 (Ltr. of Jenna Choi). And when another sister-in-law, Sunhee, came to the United States to pursue her education, Mr. Choi "immediately opened up his small home, sacrificed his car, and most of all, gave his heart and time so that [she] could adjust to life in the States . . . [t]his was when he didn't even have a business, when he had nothing himself." Ex. A at 237 (Ltr. of Sunhee Choi Lee). When Sunhee and her family returned to the United States, Mr. Choi once again welcomed them into his home with open arms. Sunhee describes that "[w]ith a father's heart, he took care of us, gave us advice, and taught us to live not only with his words, but through his actions." *Id*.

By the same token, Mr. Choi's brother-in-law, Seokwoon, writes that Mr. Choi "is someone who cares for his parents and parents-in-law from afar, even in the midst of hectic schedules during business trips." Ex. A at 196 (Ltr. of Seokwoon Yoon). He goes on to recount that "[a]round 2 years ago, while [Mr. Choi] was on a business trip to Japan, our father-in-law fainted due to a brain aneurysm. He dropped everything he was doing and cut his business in

Japan short so that he could be with the family." *Id*. Although Mr. Choi's father-in-law now suffers from dementia, he is still "eagerly waiting" for Mr. Choi's return to Korea. The family has not told Mr. Choi's father-in-law about Mr. Choi's legal troubles because they fear that the news would severely affect his health.

### d. Mr. Choi's Charitable Work & Involvement in the Church

Mr. Choi is an elder and long-time member at Bethany Presbyterian Church. He is a devout Christian, who believes fervently that his faith calls him to humanitarian and missionary work on behalf of the less fortunate. Ex. A at 96 (Ltr. of Jeong Hoan Lee) ("He is someone who pours out himself with the firm belief that he has been blessed and called by God to provide assistance to anyone he can."); Ex. A at 103 (Ltr. of Jimmy Rhee) ("Steve actively engages in community matters encompassing domestic violence, elderly care, homelessness, racism, etc . . . He is someone who not only talks but walks his strong sense of public responsibility."); Ex. A at 253 (Ltr. of Yong Ho Kim) ("Whether in the church, or in the community, I have seen Mr. Steve Choi extend much help, both materially and morally, to those who were in difficult situations at church, as well as to our fellow minority brothers and sisters."). To that end, Mr. Choi has traveled to volunteer his time and provide food, supplies, and spiritual encouragement. Ex. A at 191 (Ltr. of Scott Sohn) ("He assisted in many missionary trips to Turkey, Africa, Brazil, India and more."); Ex. A at 221 (Ltr. of Sook Rang Huh) ("When Sri Lanka was struck by the tsunami, he sent medicine, and lived thus far offering assistance to poverty-stricken places in Nepal, India, South America, and Africa.")

Mr. Choi takes his responsibility to those in need very seriously, and over the years, he has answered the call to assist without regard to his personal safety.  Most significantly, Mr. Choi has made over 30 trips to North Korea, where he and other church members built senior

living homes and contributed food, clothing, and medical supplies to North Korean orphans.  On

these trips, he was accompanied by Reverend Hyeon Soo Lim, who writes that Mr. Choi "always

showed unconditional and constant love to those who were hungry and considered this more

important than his own work." Ex. A at 63 (Ltr. of Hyeon Soo Lim).

     Mr. Choi's daughter Christine describes an early experience traveling to a war-torn Sri

Lanka with her father to deliver aid and support to Sri Lankan churches:

> I remember the first time he took us to Sri Lanka when we were children. It was
> in the middle of the long civil war that tore through the state, and days before our
> arrival, the airport had been bombed. I was very young at that time, only in
> elementary school, but it was there that my love for the world, for its people, for
> the protection of civilians, was born.

Ex. A at 26 (Ltr. of Christine Choi).  She further explains how her father's example of "giv[ing]

everything he had to this cause" inspired her, even at a young age, to help others. *Id.* Both

Christine and Eunice have followed in his footsteps by traveling on service mission trips to

countries like Guatemala and India. Today, Christine works at a human rights non-profit focused

on protecting schools from armed conflict abroad.

     Closer to home, Mr. Choi cares deeply for his fellow church members and frequently

intervenes to help when difficult situations present themselves. Ex. A at 15 (Ltr. of Bong Ho

Kim) ("When my wife had suffered from stomach cancer, Mr. Steve and his wife visited,

comforted, and prayed us for almost two months. Finally, when my wife passed away, Mr. Steve

Choi helped me both materially and spiritually[.]"); Ex. A at 216 (Ltr. of Simon Hong) ("As my

wife fell due to a stroke in the kitchen of the church, Mr. Steve Choi immediately brought my

wife to the hospital and helped us that the operation with doctors goes smoothly since we had

language barriers."). When the husband of a fellow church member, Kyong Hui Li, was

diagnosed with liver cancer, Mr. Choi jumped into action. He "regularly visited [Mr. Li] at the

hospital and later at [the Li's] home" and "share[d] encouraging and uplifting words to help ease the pain and emotions" they were going through. Ex. A at 131 (Ltr. of Kyong Hui Li). And when she faced financial struggles because of her husband's diagnosis, Mr. Choi offered Mrs. Li a job at I.L. Creations, where she still works today. She writes to this Court that she has "never met someone that is more selfless, generous and humble." *Id.*

When the father of Dr. Lois Lee, a new member of Bethany Presbyterian passed away in 2002, Mr. Choi offered to pay the funeral expenses and helped coordinate the funeral. "[D]espite not knowing us well, Mr. Choi generously provided both financial and emotional support . . . without demanding anything in return," writes Dr. Lee. Ex. A at 145 (Ltr. of Dr. Lois Lee). In the aftermath of her father's death, Mr. Choi offered Dr. Lee's mother a job at I.L. Creations (where she still works today), "giving her the means to raise two children as a single mother." *Id.*

The Reverend Young Jin Kim describes Mr. Choi's generosity to the parishioners of Bethany Presbyterian: Mr. Choi "assisted those who were undergoing financial difficulty with cancer by providing them rent and some costs of living until they were well and back on their feet, gave scholarships to college students who couldn't afford tuition so that they could finish their studies, and to the missionaries humbly serving in the missions field." Ex. A at 261 (Ltr. of Young Jin Kim). John Kim, an associate pastor at Bethany Presbyterian, agrees: "Mr. Choi has been a faithful church leader. Whatever the need whether physical, emotional, spiritual, etc., he could be counted on. Early mornings, late nights, and anytime in between." Ex 1 at 108 (Ltr. of John Kim). Fellow church member Hyun Seok Yang writes that any absence by Mr. Choi "will leave a great void in our church and the Washington Korean community as a whole." Ex. A at 70 (Ltr. of Hyun Seok Yang).

Even in the midst of the COVID-19 pandemic, Mr. Choi is trying to help members of his community.  He is deploying his musical talent to provide comfort and solace to individuals who are home-bound, hospitalized, and quarantined during this global health crisis.  The following links are to sessions Mr. Choi recorded and disseminated to local organizations: https://www.youtube.com/watch?v=h034QOjt64k&feature=youtu.be and https://www.youtube.com/watch?v=N445W84L51c&feature=youtu.be.  In addition, in response to the COVID-19 pandemic, Mr. Choi suggested to Mr. Yoo that unused food from I.L. Creations cafeterias should be donated to programs fighting hunger in the D.C. community, such as the Manna Food Center.  Mr. Yoo agreed and 2,014 pounds of food has been donated to those in need. Ex. D at 1 (Ltr. of Manna Food Center).

### e.  Mr. Choi's Advocacy & Mentorship in Korean-American Community

Mr. Choi has worked hard in service of the Korean-American community in the Washington area, taking significant time away from his business to do advocacy and mentoring in the community. Ex. A at 185 (Ltr. of S. Jae Lim) ("Steve has always believed in opening doors for the next generation of Korean Americans and has spent countless hours mentoring students at the church."); Ex. A at 39 (Ltr. of Douglas Gansler, former Attorney General of Maryland) ("Mr. Choi is a man who would and does an enormous amount for the Asian-American community in Maryland and the District of Columbia. The words that I believe describe Mr. Choi most poignantly are: humble, gracious, compassionate, and big-hearted."); Ex. A at 261 (Ltr. of Young Jin Kim) ("He is a great leader who always diligently served the elderly with a bright smile; and remembering his own difficult experiences as a child, played a great role in fostering the next generation's hopes and dreams.")

From 2004 to 2010, Mr. Choi was involved with the Washington Coalition for Comfort Women Issues ("WCCW") as chair of the board and later as president. The WCCW is a human rights non-profit that works to end sexual violence against women by promoting awareness of the history of the "comfort women".  In his role with the WCCW, Mr. Choi organized conferences, exhibits, and lectures to educate the public, and jointly spearheaded a national campaign to pass a congressional resolution[5] acknowledging the issue. Ex. A at 26 (Ltr. of Christine Choi) ("Through his work with the "comfort women" in Korea, I saw my dad fight for justice alongside those brave women—bodies beaten, bruised, and abused by Japanese soldiers, but their spirits unwavering and uncrushed, demanding truth and the apology they so deserve."). Ok Cha Soh, president of WCCW during part of Mr. Choi's tenure, observes that Mr. Choi's "character, his dedication for this good cause, and his compassion for minority victims" was a significant contribution to WCCW's work. Ex. A at 166 (Ltr. of Ok Cha Soh).

Similarly, from 2010 to 2012, Mr. Choi served as chairman of the Greater Washington Korean Community Association.  In that role, Mr. Choi spent considerable time organizing community events, advocating for local businesses, and helping new Korean-American immigrants establish themselves in this country.  Maryland State Senator Susan C. Lee explains that Mr. Choi "organize[d] and support[ed] educational and community programs and activities to assist limited English proficient immigrants, the elderly, children, and some of our state's most vulnerable individuals." Ex. A at 243 (Ltr. of Susan C. Lee). She adds that Mr. Choi is "not only respected for his compassion and generosity toward those who are less fortunate, but also for his tireless work to increase understanding, consensus, and cooperation between our richly diverse

---

[5] *See* H.R. 121, 110th Cong. (2007).

communities." *Id.* Whether through providing employment, support, mentorship, or advice, Mr. Choi made an impact in countless lives.

The story of Haniee Chung is illustrative.  Ms. Chung is the daughter of a friend of the Choi family. After finishing high school, Ms. Chung was unable to qualify for any financial aid for college because she was a dependent on her father's student visa. Mr. Choi provided the scholarship funds for her to attend a local community college and obtain her associate degree. From there, Ms. Chung transferred to Georgetown University and went on to attend the Georgetown School of Medicine. Today, she is a surgeon at the Johns Hopkins School of Medicine. As she tells this Court, "[i]t would not be an exaggeration to say that without Steve's help, I would not be where I am today." Ex. A at 53 (Ltr. of Haniee Chung). Mr. Choi's influence continues to affect how Ms. Chung practices today. *Id.* at 54 ("Having been Steve's beneficiary has so shaped the course of my life and character, that his influence continues to ripple into my community through the patients I treat and the trainees and staff I work with.").

Another representative example is S. Jae Lim. As a young member of Mr. Choi's church, Mr. Lim also benefitted tremendously from Mr. Choi's mentorship. Mr. Choi encouraged Mr. Lim's interest in political science, landing him his first internship with a political campaign and frequently taking him along to meetings with local politicians. Later, as he sought to apply to law school, Mr. Lim writes that Mr. Choi "introduced me to as many lawyers as he could find in his Rolodex" and that he "opened doors that were otherwise unbeknownst to me." Ex. A at 185 (Ltr. of S. Jae Lim). Mr. Lim went on to graduate from the University of Virginia School of Law and now works as an Assistant Attorney General in the Tax Division of the Tennessee Attorney General's Office. Today, Mr. Lim writes to this Court that he has read the criminal information

against Mr. Choi and is "relieved that Steve has accepted responsibility for his actions and confident that he has learned his lesson." *Id.*

### f. Mr. Choi's Medical History & Diagnoses

Mr. Choi suffers from high cholesterol, for which he takes prescribed medication, including Simvastatin, Fenofibrate, and Tamsulosin.  He has also been diagnosed with adenomatoid thyroid nodule and L-disc disease with radiculopathy.  Mr. Choi has endured a long history of severe back pain and degenerative disc problems caused by heavy lifting.  Despite medical advice to the contrary, he declined surgery and instead, received cortisone injections on two occasions.  Finally, Mr. Choi has been diagnosed with major depressive disorder and generalized anxiety disorder.  He is under a doctor's care, taking Escitalopram and Zolpidem for insomnia.

### THE ADVISORY GUIDELINE CALCULATION

Mr. Choi pled guilty to a single count of willful failure to collect, account for, and pay over employment tax in violation of 26 U.S.C. § 7202.  As noted in the Presentence Report, Mr. Choi and the Government agree that the base offense level is 26 pursuant to U.S.S.G. §§ 2T1.6 and 2T4.1K.  Because Mr. Choi "has clearly demonstrated acceptance of responsibility for the offense," and "has assisted authorities in the investigation or prosecution of [his] own misconduct by timely notifying authorities of the intention to enter a plea of guilty," the Government has agreed to recommend a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, resulting in an adjusted offense level of 23.  As Mr. Choi has no criminal history, the applicable Guidelines range is 46 to 57 months, and the applicable fine range is $20,000 to $200,000.  Under the terms of the Plea Agreement, and considering the

substantial order of restitution ($11,394,336.19) and his limited resources, Senior U.S. Probation

Officer Lustig recommends that no fine be imposed.

## APPLICABLE LAW

"It has been uniform and constant in the federal judicial tradition for the sentencing judge

to consider every convicted person as an individual and every case as a unique study in the

human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  In arriving at a reasonable sentence, the

judge must "make an individualized assessment based on the facts presented" in a particular

case. *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Court "should begin all sentencing proceedings by correctly calculating the

applicable Guidelines range." *Gall*, 552 U.S. at 49.  However, "[t]he Guidelines are not the only

consideration." *Id*.  Rather, the Guidelines provide a "starting point" for the Court's sentencing

considerations.  *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007).

Moreover, a court should not presume "that the Guidelines range is reasonable."

*Gall,*552 U.S. at 50.  Instead, under *United States v. Booker*, the Court should consider each

factor set forth in 18 U.S.C. § 3553(a) in determining an appropriate and reasonable sentence.

543 U.S. 220, 259–60 (2005). In *Rita v. United States*, 551 U.S. 338, 347-48 (2007), the

Supreme Court summarized the now oft-cited factors found in that second paragraph: the "(1)

offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of

sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d)

rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing

Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need

for restitution."  In considering these factors, the Court need not find "extraordinary

18

circumstances to justify a sentence outside of the Guidelines range." *Gall* at 47; *see* Terry Carter, *The Judge Who Said No*, ABA Journal, Oct. 2013, at 53 (the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." Judge Rakoff).

## A Downward Variance Is Warranted

### 1) The Nature of the Offense

Mr. Choi's crime was not one of highly orchestrated, complex tax fraud or of unmitigated greed.  It was an abject failure of competent leadership with respect to clear and mounting liabilities until early 2016, when Mr. Choi accepted full responsibility for his conduct and began working closely with his representatives to come into compliance and attempt to save the business. Ex. A at 147 (Ltr. of Matthew Yoo) ("I advised him that we needed his complete attention and focus on the Company. But he said that he believed and trusted the ILC management team to take care of everything, and that he could not stand still and see the Association struggling and not being able to effectively deal with and help so many Korean-Americans in need.").  Mr. Choi takes full responsibility, and is extremely remorseful, for his conduct.

Starting in 2010, Mr. Choi, as an employer through the various, related businesses, began to fall behind on making quarterly employment tax and sales and use tax payments.  Despite meeting with tax authorities and having notice of the liabilities, Mr. Choi failed to properly address the situation and instead, delegated operations to employees without providing the necessary guidance or resources to correct the problem. In addition, rather than curtail operations to address the mounting liabilities, Mr. Choi opted to expand to new locations in the belief that the solution lay simply in additional gross receipts.  During this time, one bad business decision

19

followed another and a substantial portion of the business revenues were applied to penalties, interest, and other fines and fees due to disorganization, late payments to vendors and providers, and general lack of compliance.

By late 2015, the balances due were overwhelming, and any payments for prior periods through voluntary remittances or levies of receivables were barely enough to cover penalties and interest due and accruing.  Since 2016, I.L. Creations has filed timely employment tax returns and timely collected, accounted for, and deposited tax due.  Mr. Choi has worked with the federal and state tax authorities to address the unpaid tax liabilities and maintain the company's operations. He has taken full responsibility for his failure to comply with the law and is deeply remorseful for his actions.

### 2)  The History and Characteristics of the Defendant

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006). "This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Id.*  A variance or departure is appropriate where, as here, the defendant has lived an extraordinarily good and law-abiding life. *See id.* at 507, 513–15; *see also United States v. Howe*, 543 F.3d 128, 131–32 (3d Cir. 2008) (affirming a sentence of home confinement and probation instead of 18–24 months incarceration where defendant's life was marked by outstanding devotion to family, community, and church); *United States v. Thurston*, 544 F.3d 22, 24, 26 (1st Cir. 2008) (affirming a three-month sentence

for Medicare fraud conspiracy of more than $5 million based on, among other things, defendant's support and assistance of others).

In *United States v. Adelson*, the CEO of a medical company was convicted of conspiracy, securities fraud, and causing false reports to be filed with the SEC. 441 F. Supp. 2d at 507. Despite the advisory guidelines range of life in prison, the court sentenced the defendant to 42 months. *Id*. at 507, 511.  In explaining the extraordinary variance, the court held that the defendant's "past history was exemplary" and that "persons from all walks of life . . . attest[ed], from personal knowledge, to [the defendant's] good works and deep humanity." *Id*. at 513.   The court held that a substantial variance was "fair, just, and reasonable", because the defendant had demonstrated an "ever-present willingness to go above and beyond the call of duty to help others." *Id*. at 513, 515.

Mr. Choi's extensive charitable works, advocacy for and service to his community, and past employment of thousands of D.C.-area residents demonstrate that "society will be best served" by allowing him to "continue his good works outside of prison." *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (affirming a sentence of two years' probation and community service for a § 7201 violation carrying a 46 to 57-month Guidelines range). Mr. Choi's charitable work is not merely financial in nature but has involved and continues to involve significant commitments of his personal time and energy. *See United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (*en banc*) (affirming downward variance to home confinement and probation for § 7201 defendant who performed "charitable acts that involved not only money, but also his personal time"); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (affirming downward departure because defendant's actions were "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others"). In sum, Mr. Choi has

21

spent a lifetime helping others without asking for anything in return and as noted herein, his efforts in this regard are continuous, selfless, and extraordinary. Much less has supported downward variances in more egregious cases. *See, e.g., United States v. Fishman*, 631 F. Supp. 2d 399, 404 (S.D.N.Y. 2009) (imposing 15 month sentence despite Guidelines range of 27-33 months for former attorney convicted of 13 year pattern of fraud in light of charitable and volunteer work).

In addition, as noted herein, Mr. Choi's family is his moral center and, while he has always been a devoted, loving and loyal son, husband and father, since March 2020, he has become a primary caretaker for his elderly parents, who rely on Mr. Choi and his wife almost exclusively as a result of the restrictions and perils associated with the current pandemic. Even before the Supreme Court determined that the Guidelines were advisory, courts around the country were granting downward departures in cases where a defendant provided emotional and financial support to family members. *See, e.g., United States v. Galante*, 111 F.3d 1029, 1035,1037 (2d Cir. 1997) (noting that families of defendants are intended beneficiaries of downward departures on the ground of extraordinary circumstances relating to family responsibilities; affirming downward departure and finding that if defendant were imprisoned the family unit would be destroyed); *United States v. Johnson*, 964 F.2d 124, 129-130 (2d Cir. 1992) (affirming downward departure based on potential hardship to defendant's dependents); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure based on family responsibilities). Since *Booker,* sentencing courts enjoy even greater discretion to consider the impact a sentence of incarceration will have on a defendant's family. *See, e.g., United States v. Burks*, 2010 WL 1221752, at *2 (E.D.N.Y. Mar. 29, 2010) (imposing sentence of one month incarceration and five years' probation despite advisory Guidelines range of 57-71

months in fraud case where, *inter alia*, the defendant provided his family with emotional and financial support).

Courts also have "recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation." *United States v. K*, 160 F. Supp. 2d 421, 442 (E.D.N.Y. 2001). This is particularly true where, as here, the defendant's rehabilitation is self-motivated and "undertaken not at the direction of, or under supervision by, any court, but on his own initiative." *See Gall* 552 U.S. at 57, 59 (upholding sentence of probation for drug offender who had successfully turned his life around and holding that the District Court "reasonably attached great weight to [the defendant's] self-motivated rehabilitation"); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016) (granting non-custodial sentence in part because of defendant's "efforts at rehabilitation while she has been at liberty for approximately the past year and a half").

As noted, in late 2015, Mr. Choi took responsibility for his failure to comply with the internal revenue laws, engaged qualified tax and accounting professionals, and ensured that the companies met their employment tax obligations in a timely manner.  While these efforts do not eliminate the substantial liabilities that remain outstanding or eliminate the conduct that brings Mr. Choi before this Court, we ask that these efforts at rehabilitation, nearly five years ago, be taken into account as mitigation and support for a downward variance.

Finally, only 3.1% of federal offenders are over 60 years old. U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* at 51.[6]  Our federal prison

---

[6] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report-and-Sourcebook.pdf.

facilities and procedures are designed to accommodate much younger inmates—while the needs

of the elderly are often ignored. *See* Jamie Fellner, *Old Behind Bars: The Aging Prison*

*Population in the United States*, Human Rights Watch (Jan. 27, 2012) ("Prison officials are hard-

pressed to provide conditions of confinement that meet the needs and respect the rights of their

elderly prisoners.").[7]  Thus, older inmates, "even if they are not suffering illness, can find the

ordinary rigors of prison particularly difficult because of a general decline in physical and often

mental functioning which affects how they live in their environments and what they need to be

healthy, safe, and have a sense of well-being." *Id.*  Elderly inmates are also much more

vulnerable to abuse or threats by younger inmates. *See id.*  These challenges accelerate the aging

process, leading to permanent physical and psychological impairments. The Department of

Justice recognizes this reality:

> Elderly inmates . . . reveal accelerated signs of aging and deterioration of health
> [including] increased rates of incontinence, sensory impairment, impaired
> flexibility, respiratory illnesses, cardiovascular disease, and cancer. . . . [T]heir
> aging processes [accelerate] to an average of 11.5 years older than their
> chronological ages after age 50. Ordinary cognitive impairments of age aside,
> [elderly offenders experience] decreased sensory acuity, muscle mass loss,
> intolerance of adverse environmental conditions, dietary intolerance, and general
> vulnerability precipitate collateral emotional and mental health problems.

U.S. Dep't of Justice, National Institute of Corrections, *Correctional HealthCare: Addressing*

*the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* at 10 (2004).[8]

If sentenced to incarceration, Mr. Choi will enter the federal prison system at the age of

59.  Such a sentence will assuredly take a debilitating physical toll on him, aggravating the

conditions from which he already suffers (severe back pain, depression, and anxiety) and likely

creating new medical issues. As will be discussed further *infra*, an incarcerative sentence during

---

[7] https://www.hrw.org/report/2012/01/27/old-behind-bars/aging-prison-population-united-states.
[8] https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf

a COVID-19 pandemic will almost certainly lead to serious age-related medical issues for Mr. Choi and potentially death.

Here at sentencing, where he must atone for the worst mistake of his life, Mr. Choi humbly asks that this Court consider his good works, family ties, efforts at rehabilitation, age and personal characteristics, and weigh them against the nature and circumstances of his crime.

### 3)   The Purpose of Sentencing

Each sentence imposed under the Guidelines should be determined based on the relevant facts and circumstances, and designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The need for a sentence to promote respect for the law does not invariably weigh in favor of imposing incarceration whenever it is among the available sentencing options.  In *Gall, supra,* the Supreme Court agreed that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id.* at 54.

By accepting responsibility during the investigation, Mr. Choi demonstrated his respect for the law, the government, and this court. *See United States v. Moore,* 344 Fed. App'x. 767, 769-70 (3d Cir. 1990) (affirming probation where defendant pled guilty to tax evasion and faced an advisory Guideline range of 18 to 24 months).  He is devastated and shamed by the situation he created.  A downward variance resulting in a substantial period of home detention and

25

community service will convey the seriousness of, and provide significant punishment for, his conduct, while offering a substantial benefit to society through his continued good works.

Moreover, incarceration is not required to provide Mr. Choi with additional educational or vocational training, medical care, or other correctional treatment.  He does not use illegal drugs, has no addictions, and, in light of the current global health crisis, does not need the assistance of the Bureau of Prisons to access medical care.  *See* 18 U.S.C. § 3582(a) ("imprisonment is not an appropriate means of promoting correction and rehabilitation.").

With these factors addressed, we recognize that Mr. Choi's sentence must satisfy the goal of affording specific and general deterrence to criminal conduct as contemplated by 18 U.S.C. § 3553(a)(2)(B), and we submit that the proposed sentenced satisfies these concerns.

First, Mr. Choi's family, friends, congregation, business associates, charitable and community organizations, vendors, employees and their families, and anyone with access to the internet are aware of Mr. Choi's conduct and the adverse impact of his conduct on himself and others.  Indeed, in an unexpected way, the impact of the pandemic and the resulting delay in sentencing, during which Mr. Choi in effect lives *within* the community but essentially is precluded from living his former life, have, to a large measure, achieved the salutary sentencing goals of specific and general deterrence.

Moreover, over the past year, Mr. Choi has continued to work with his representatives to identify ways to make amends.  For example, after years of trying, Mr. and Mrs. Choi are finally selling their personal residence, with all net proceeds going to the tax authorities.

Mr. Choi is deeply remorseful, humiliated, and seeking forgiveness.  He is struggling with clinical depression and anxiety, exacerbated by this situation of his own making.  His wife Leena is concerned for his mental health: "[M]y daily routine has become covering him with a

blanket on the couch outside, early in the morning, where he sleeps in a ball, finally having fallen

asleep after tossing and turning due to his remorse, regret, and sorrow at the mistakes he's made

in neglecting the company while he was serving the community." Ex. A at 139 (Ltr. of Leena

Choi).  Mr. Choi's daughters share her mother's concerns: "I see the sorrow and remorse in my

father, who used to be such a big, larger than life source of laughter for our family, now reduced

to but a shell of a man he used to be" Ex. A at 27 (Ltr. of Christine Choi); "I have seen his

demeanor change as he has continued to reflect and punish himself over the past few months."

Ex. A at 45 (Ltr. of Eunice Choi). This pain and substantial suffering will continue for Mr. Choi

as he attempts to make amends for the damage he has caused. *See United States v. Gardellini*,

545 F.3d 1089, 1091, 1095 (D.C. Cir. 2008) (affirming as relevant to the 3553(a) analysis that

defendant had "already suffered substantially" due to criminal investigation, including having

been treated for depression).

Moreover, in light of the collateral consequences of his criminal conviction, including the

substantial, non-dischargeable restitution order, which will encumber Mr. Choi's assets and

income for the rest of his life, and his debarment from government contracts, Mr. Choi will never

again be in a position to commit employment tax violations. *See United States v. Bikundi*, No.

14-cr-30-2 (BAH), 2020 WL 3129018, at *4 (D.D.C. June 12, 2020) (finding that a $40 million

forfeiture and $80 million joint restitution meant that defendant would pay for his crime "likely

for the remainder of his life" and granting compassionate release due to risk to defendant from

COVID-19 pandemic).  Accordingly, there is no risk of recidivism or need for specific

deterrence in this case.

Turning to general deterrence, it must be noted that this objective of sentencing does not

require incarceration. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010). Indeed,

empirical evidence suggests that incarceration does little to deter crime. *See* National Institute of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* at 1 (May 2016) ("Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.").[9]

In *United States v. Courtney,* 76 F. Supp. 3d 1267 (D.N.M. 2014), the sentencing court considered incarceration for purposes of general deterrence and noted the logic in assuming that a would-be offender would only commit a crime "when the benefit . . . outweighs the product of the likelihood of getting caught and brought to justice . . . multiplied by the detrimental impact of the punishment." *Id.* at 1304 n.13.  Yet, the court opined that this theory "does not work in the real world; it has been falsified by empirical research. The model is dead, and facts, not theory, killed it. If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate." *Id*. But "[a]n avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world." *Id*.

Another federal court agreed, finding that it is "the sentencing guidelines and statutory sentencing provisions" that have the largest effect. *United States v. Del Campo*, 695 F. App'x 453, 459 (11th Cir. 2017).  Both "send a clear message that the presumptive penalty" for criminal conduct is imprisonment. *Id*.  In other words, "what effects general deterrence . . . is the probability and *expected* severity of punishment attending a given offense, rather than the extent of an upward or downward variance in an outlier case." *Id*. (affirming a non-custodial sentence for a defendant convicted of a $1.38 million bank fraud and holding "[a]s far as this court can

---

[9] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

tell, there do not appear to be many 71-year-old title attorneys in poor health awaiting our decision to determine whether helping their friends to commit bank fraud will be 'worth it.'").

Of course, that is not to say that news of Mr. Choi's guilty plea and substantial restitution has not spread widely in the D.C.-area business community.[10]  Rather, it is simply to point out that for those potential wrongdoers paying attention to Mr. Choi's sentence, the punitive quality of the charges, the booking process, supervised release, substantial home detention, and community service, coupled with the tremendous restitution that will be ordered in this case and the related collateral consequences, including financial ruin, are more than capable of deterring most individuals considering similar tax offenses. *See United States v. Mousseau*, 599 F. App'x 726, 727 (9th Cir. 2015) (payment of restitution "serves penal objectives, such as deterrence, rehabilitation and retribution."); *Warner*, 792 F.3d at 861 (recognizing that severe civil penalties serve general deterrence purposes; *Bikundi*, 2020 WL 3129018, at *4 ("[S]uch serious penalties send a clear message that those who commit such frauds will be unable to enjoy the fruits of their crimes and provides deterrence to both defendant and others from future criminal conduct.").

A sentence of time served, home detention, and community service would appropriately serve the purpose of just punishment. As discussed, Mr. Choi has experienced a multitude of adverse collateral consequences as a result of his tax crime. *See United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming that district court's consideration of defendant's loss of teaching license and state pension was consistent with "3553(a)'s directive that the sentence reflect the need for just punishment"); *see also United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a "just punishment" if it does

---

[10] *See* U.S. Dep't of Justice, *Press Release: Government Food Service Provider Pleads Guilty to Payroll Tax Fraud* (Feb. 7, 2020), https://www.justice.gov/opa/pr/government-food-service-provider-pleads-guilty-payroll-tax-fraud.

not consider the collateral effects of a particular sentence."). In addition to the standard consequences of any felony conviction, Mr. Choi faces a staggeringly large restitution assessment that is not subject to compromise or discharge, and he will never again lead the business that he spent more than two decades building. *See Nesbeth*, 188 F. Supp. 3d at 194 (finding that narcotics defendant was already "sufficiently punished" by permanent loss of her future teaching career).

Finally, the most important aspect of deterrence – the certainty of punishment – is firmly in place. Mr. Choi committed a crime and will be punished. Under the facts and circumstances of this case, the proposed sentence would be "sufficient, but not greater than necessary" to "afford adequate deterrence to criminal conduct." U.S.C. § 3553(a)(2)(B); *United States v. Hodges*, No. 10-CR-624, 2014 WL 3695491, at *2 (E.D.N.Y. July 23, 2014) (holding general deterrence may be achieved by a felony conviction and its collateral consequences).

### 4)  The Kinds of Sentences Available

This court has the authority and may exercise its discretion to consider a wide range of alternatives to imprisonment, and must consider the kinds of sentences available, including probation, supervised release, and periods of home detention. *See* 18 U.S.C. §§ 3551(b)(l), 3561, 3562, 3563(b)(4) and 3583; U.S.S.G. § 5Fl.2.  In fact, 18 U.S.C. § 3553(a)(3) requires consideration of sentences *other than* imprisonment, and the severity of a non-custodial sentence should not be underestimated.  As the Supreme Court stated in *Gall:*

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights,* 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which ever citizen is entitled.") *(quoting Griffin v. Wisconsin,* 483 U.S . 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation

30

> officer or the court. They must report regularly to their officer, permit
> unannounced visits to their homes, refrain from associating with any person
> convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5Bl.3. Most
> probationers are also subject to individual 'special conditions' imposed by the
> court.

552 U.S. at 48 (footnote omitted).  The Court agreed that a sentence of probation reflected the

seriousness of Gall's offense and that no term of imprisonment was necessary:

> Any term of imprisonment in this case would be counter effective by depriving
> society of the contributions of the Defendant who, the Court has found,
> understands the consequences of his criminal behavior and is doing everything in
> his power to forge a new life. The Defendant's post-offense conduct indicates
> neither that he will return to criminal behavior nor that the Defendant is a danger
> to society. In fact, the Defendant's post-offense conduct was not motivated by a
> desire to please the Court or any other governmental agency, but was the pre-
> Indictment product of the Defendant's own desire to lead a better life.

*Id.* at 44-45.

### *Supervised Release*

Mr. Choi requests a sentence of one day of incarceration (to be satisfied by time served)

and three years' supervised release, including conditions of home detention and substantial

community service.  Under 18 U.S.C. § 3583, the sentencing court has the authority to impose

supervised release in addition to a term of imprisonment.[11]  The statutory requirement that

supervised release follow a "term of imprisonment" may be satisfied by even a one-day sentence

– and courts routinely impose such sentences. *See United States v. D'Oliveira,* 402 F.3d 130, 132

(2d Cir. 2005) ("A sentence of time served, i.e., the period of time served, *does* constitute a

sentence of imprisonment.") (quoting *Rodriguez v. United States,* 111 F. Supp. 2d 112, 114 (D.

Conn. 1999)); *see also United States v. Herlihy*, No. CR 15-2218 (JB), 2020 WL 1033411, at

*17 (D.N.M. Mar. 3, 2020) (sentencing defendant to one day incarceration with time served and

---

[11] *See* U.S.S.G. § 5D1.1(b) ("The court may order a term of supervised release to follow
imprisonment in any other case.")

three years of supervised release). Such sentences are also routinely deemed satisfied by application of a time served credit by the BOP, which has the statutorily delegated discretion to calculate all time served credits for federal defendants. *See, e.g.*, *United States v. Mallatt*, No. 4:13CR3005, 2013 WL 6196946, at *19 (D. Neb. Nov. 27, 2013) ("[A] sentence of time served followed by lengthy and structured supervised release will promote respect for the law and afford an adequate level of deterrence to similar criminal conduct."); *see also* 18 U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences."); *United States v. Wilson*, 503 U.S. 329, 335 (1992) (holding that BOP has the responsibility to determine time served credit – not the sentencing court). Per standard BOP policy,[12] defendants receive a one-day time served credit for the day of booking or processing by the U.S. Marshal's Service.

Supervised release properly serves the sentencing concerns reflected in 18 U.S.C. § 3553(a)(2). It is a punitive, custodial sentence, imposing "various terms and conditions which restrict [the defendant's] freedom and make him vulnerable to further punishment should he violate them." *United States v. Gilchrist*, 130 F.3d 1131, 1134 (3d Cir. 1997), *cert denied*, 523 U.S. 1023 (1998) (quoting *United States v. Dozier*, 119 F.3d 239, 242 (3d Cir. 1997)); *see also United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017) ("[Defendant's] condition is imposed as part of his supervised-release sentence, and is not a post-custodial restriction[.]"); *United States v. Ginyard*, 215 F.3d 83, 87 (D.C. Cir. 2000) (*per curiam*) ("Supervised release is punishment[.]"). Similarly, supervised release serves general deterrence, giving notice to the

---

[12] Bureau of Prisons, *Sentence Computation Manual*, 1-15A, available at https://www.bop.gov/policy/progstat/5880_028.pdf ("If the defendant is released on bail or on "own personal recognizance" then that day is treated as a day in official detention and shall be awarded as a day of prior custody time credit.").

public of ongoing negative consequences of a criminal conviction. *See United States v. Mathis-Gardner*, 110 F. Supp. 3d 91, 95 (D.D.C. 2015) ("As one component of punishment, supervised release serves to further the goal of general deterrence.").

Under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(a), the court must include a number of mandatory conditions in a supervised release sentence, such as not committing another offense, not unlawfully possessing an unlawful controlled substance, and adhering to any court-ordered restitution payment schedule. Aside from those terms, the sentencing court is "afforded wide discretion when imposing terms and conditions of supervised release." *United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (quoting *United States v. Sullivan*, 451 F.3d 884, 895 (D.C. Cir. 2006)), *cert denied*, 568 U.S. 857. That wide discretion is cabined by the statutory requirements that a condition (1) be "reasonably related" to the § 3553(a) factors; (2) involve "no greater deprivation of liberty than is reasonably necessary for serving the purposes" of § 3553(a)(2); and (3) be consistent with any pertinent Sentencing Commission policy statements. *See* 18 U.S.C. § 3583(d). The Sentencing Commission's policy statement at U.S.S.G § 5D1.3(c) also provides a number of recommended standard discretionary conditions available to this Court.

Here, Mr. Choi will receive a one-day time served credit from BOP for the day of his processing by the U.S. Marshal's Service. Accordingly, this Court may sentence Mr. Choi to one day of incarceration and supervised release, without requiring him to stay overnight in a prison facility and bear the substantial risk of contracting COVID-19.  As discussed further *infra*, the uniquely dangerous pandemic conditions in BOP facilities bear on this Court's consideration of Mr. Choi's history and characteristics and strongly justify the imposition of a non-incarcerative sentence. As discretionarily imposed conditions of his supervised release, Mr. Choi requests

conditions of two years of home confinement in lieu of a substantial term of imprisonment, and

substantial hours of community service. These conditions are reasonably related to the need for

just sentencing that reflects the seriousness of Mr. Choi's tax crime, serve general and specific

deterrence, and are no greater a deprivation than is reasonably necessary.

### *Home Detention*

The Sentencing Commission recognizes that home detention is a permissible special

condition of supervised release as a substitute for imprisonment. U.S.S.G. § 5D1.3(e)(2).  Home

detention is defined as:

> .... a program of confinement and supervision that restricts the defendant to his
> place of residence continuously, except for authorized absences, enforced by
> appropriate means of surveillance by the probation office. When an order of home
> detention is imposed, the defendant is required to be in his place of residence at
> all times except for approved absences for gainful employment, community
> service, religious services, medical care, education or training programs, and such
> other times as may be specifically authorized. Electronic monitoring is an
> appropriate means of surveillance and ordinarily should be used in connection
> with home detention. However, alternative means of surveillance may be used so
> long as they are as effective as electronic monitoring.

U.S.S.G. § 5Fl.2 (Commentary).  Home detention has gained acceptance in the federal criminal

justice community as a credible sanction and alternative to incarceration.[13]  Judges have imposed

home confinement more frequently as they have "learned more about what it offers" and

discovered its cost effectiveness.[14]  The Guidelines mandate that electronic monitoring should

ordinarily be used in connection with home detention, though alternative means are sometimes

permitted.[15]  Here, home detention with electronic monitoring and specified approved absences

---

[13] Darren Gowen, *Overview of the Federal Home Confinement Program,* 64 Federal Probation,
1, 12 (Dec. 2000), *available at* https://www.uscourts.gov/sites/default/files/64_2_2_0.pdf.
[14] *Id.* at 11.
[15] U.S.S.G. § 5F1.2, Application Note. 1.

would impose significant restrictions on Mr. Choi, while still allowing him to provide much needed assistance to his parents and his community.

### *Community Service*

Community service is recognized by federal and state courts as "a burdensome penalty that meets with widespread public approval, is inexpensive to administer ... produces public value ... and ... can to a significant extent be scaled to the seriousness of the crimes."[16] Community service is also "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair - a 'win-win ' proposition for everyone involved."[17]

The Office of the U.S. Courts recognizes that "community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation ... It restricts offenders' personal liberty ... allows offenders to atone or 'make the victim whole' in a constructive way ... [and] may be regarded as ... a form of symbolic restitution when the community is the victim."[18]  In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends:

> .... Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service ... Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.[19]

---

[16] Michael Tonry, Intermediate Sanctions In Sentencing Guidelines 11, Nat'l Inst. of Justice (1997), *available at:* http://www.nejrs.gov/pdffiles/ 165043.pdf.

[17] *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service,* Office of Probation and Pretrial Services, Administrative Office of the U.S. Court, 2005, *available at:* http: //www.uscourts.gov/misc/revision-community.pdf

[18] *Id.*

[19] *Id.*

In *United States v. Shamilzadeh,* No. 04-1094 (JG) (E.D.N.Y., Apr. 1, 2008), a major fraud case in the Eastern District of New York, Judge John Gleeson spoke to the value of community service:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.
>
> * * * * *
>
> In fact, you know, one might say how could, no matter what the timing of the cooperation, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?
>
> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.
>
> I'm placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months. Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.[20]

---

[20] Ex. F, Defendant's Sentencing Memorandum at 27-28, *United States v. Warner*, No. 1:13-cr-00731 (CPK) (N.D. Ill. Jan. 14, 2014) (quoting Sentencing Transcript, *United States v. Shamilzadeh,* No. 04-1094 (JG) (E.D.N.Y., Apr. 1, 2008)).

In a case involving an offshore account and tax evasion with a combined financial penalty of over $80 million, Senior Judge Charles Kocoras in the Northern District of Illinois imposed a sentence of community service stating:

> The hard question in this case is whether or not, given all of the relevant circumstances of the crimes and of the defendant, himself, some period of incarceration should be imposed ....
>
> As I stated earlier, the sentencing statute and factors described run in different directions. So, it is left to me to weigh them all and balance them, as best as I am humanly able. While the crime for which he stands convicted is a serious one, it goes to the essence of how we govern ourselves.
>
> One of the considerations for me is whether society would be better off with Mr. Warner in jail or whether it would be best served by utilizing his talents and beneficence to help make this a better world.
>
> Mr. Warner will be placed on probation for a period of two years , with the following conditions : That he will provide at least 500 hours of community service. This has been, for the parties and for me, as well, as most sentencings are, a difficult case. But, in the end [] in the end [] as you can tell from my remarks, what I found most significant is that, yes, he committed crimes; he hid; he acted in a way a lot of other people act, who try to cheat the government. And I spent of a lot of hours trying to figure out why people do that …
>
> I do not know the motivations; and, frankly, I do not know Mr. Warner's either. But it is not that, that triggers whatever a proper sentence will be in this case because in Mr. Warner ' s case, as I have alluded to quite frequently in this presentation of my own, he did things that I am not aware anyone else does. Certainly, not anyone before me. And it would be unjust for me to ignore that, not measure it and not say, in the end, that trumps all of the ill-will and misconduct he engaged in.
>
> And really - and I believe this with all of my heart - society will be best-served by allowing him to continue his good works.[21]

---

[21] Ex. E, *United States v. Warner*, No. 1:13-cr-00731 (CPK) (N.D. Ill. Jan. 14, 2014), Sentencing transcript at 50-53.

Like Warner and Shamilzadeh, Mr. Choi is an outstanding candidate for community service given his extreme remorse for his conduct, good character and reputation, strong work ethic, and history of extensive community service to the community.  He is a first-time offender, he has no history of violence, and he is highly motivated to continue aiding others, as is evident from his extensive past charitable efforts.  A rigorous and appropriately structured community service would serve the needs of justice by taking Mr. Choi's time and efforts and putting them to use in a constructive and useful manner.

Based on the foregoing, we respectfully request a sentence of time served and supervised release with the condition of home detention and substantial community service. This  condition is nearly identical to that imposed in by a neighboring court in *United States v. Venuti,* 10-00235-WMN (D. Md., Nov. 2, 2010) *(see infra)*, where the defendant pled guilty to three counts of willful failure to file a tax return under 26 U.S.C. § 7203.

### 5)  The Guidelines

Commentators have criticized the overemphasis on loss as the single most significant factor in determining the advisory range in white collar cases,[22] and the courts have echoed agreement. *See United States v. Parris,* 753 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (J. Block) (varying from an advisory range of 360 months to life down to 60 months, noting that, "the Sentencing Guidelines for white-collar crime [can produce] a black stain on common sense"); *United States v. Adelson,* 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.), *affirmed* 301 F. App'x 93 (2d Cir. 2008) (varying from an advisory range of life down to three and half years,

---

[22] *See, e.g.*, Alan Ellis, John R. Steer, and Mark H. Allenbaugh, *At a "Loss" for Justice-Federal Sentencing for Economic Offenses*, 25 WTR Crim. Just. 34, 35 (2011), *available at* https://alanellis.com/at-a-loss-for-justice-federal-sentencing-for-economics-offenses-alan-ellis-john-r-steer-and-mark-h-allenbaugh/.

contending that "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.").

In fact, the levels for tax-related offenses have significantly increased in the last 30 years. *See* U.S.S.G. § 2T4.1 (effective November 1, 2011) and Historical Note (Appendix C, Amendment 237). While it is reasonable for tax offenders to face incarceration in many cases, strict application of the Guidelines and/or imposition of a prison sentence within the advisory Guidelines range would be more than necessary to meet the purposes of sentencing in this case. In light of the downward trend in sentences for tax offenders as discussed more fully *infra,* a variance is appropriate in this case.

### 6)   Pertinent Policy Statements of the Sentencing Commission

In November 2010, the Guidelines were amended, increasing a judge's ability to impose sentences that include alternatives to incarceration. In support of the amendments, the Sentencing Commission explained its multi-year study of alternatives to incarceration: "The Commission initiated this study in recognition of increased interest in alternatives to incarceration by all three branches of government and renewed public debate about the size of the federal prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders."[23]  Here, a variance sentence of time served and supervised release with conditions of home detention and community service recognizes and addresses the issues and concerns that prompted the Commission's study.

---

[23] United States Sentencing Comm'n, Amendments to the Sentencing Guidelines at 2 (May 3, 2010), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20100503_RFP_Amendments_0.pdf.

### 7)   The Need to Avoid Unwarranted Disparities Among Similar Offenders

Under 18 U.S.C. § 3553(a)(6), a district court is instructed to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when imposing a sentence. In fact, this mandate was the primary impetus for the creation of the Federal Sentencing Guidelines.

In 1984, Congress passed the Sentencing Reform Act ("SRA") in an attempt to eliminate the disparities for similarly situated offenders that had existed for the prior 50 years under the indeterminate sentencing model. The SRA created and authorized the Sentencing Commission to establish sentencing policies and practices that:

> [P]rovide certainty and fairness in meeting the purposes of sentencing, *avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct* while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.

28 U.S.C. § 991(b)(l)(B) *(emphasis supplied).*

The Sentencing Commission continues to underscore the need to avoid unwarranted sentencing disparity. Specifically, the Sentencing Commission stated in its 2007 Annual Report:

> The *guidelines are intended to promote fairness* through the establishment of sanctions proportionate to the severity of the crime and *the avoidance of unwarranted disparity by setting similar penalties for similarly situated offenders.*
>
> * * * * *
>
> Disparity in sentencing has long been a concern for Congress, the criminal justice community, and the public.

U.S. Sentencing Comm'n, 2007 Annual Report, 1 *(emphasis supplied).*

A review of recent federal criminal tax cases shows that a downward variance in this case is consistent with sentences imposed on similarly situated offenders. The Sentencing

40

Commission reported 547 sentences imposed from October 1, 2018 through September 0, 2019, where the primary offense was tax-related.[24]  Of those cases, only 27.1% (148 of 547) received sentences within or above the Guidelines range.[25]  Of the 311 cases where the primary offense was tax-related and the court varied downward based on factors under 18 U.S.C. § 3553(a), the median sentence involved only 8 months of incarceration and involved a median decrease of 12 months.[26]  This trend continues. *See e.g.*, *United States v. Gazdick*, No. 19-cr-00200 (E.D. Va. Nov. 8, 2019) (18 months' incarceration for defendant charged with employment tax violations and felon-in-possession with Guidelines range of 37-46 months and tax loss of over $5 million).

In *United States v. Pursley*, No. 4:18-CR-575 (S.D. Tex. Aug. 12, 2020), following a trial, an attorney was convicted of conspiring to defraud the United States and three counts of tax evasion.  Mr. Pursley "designed a complex scheme to defraud the United States out of more than $6 million dollars in tax revenue by disguising the repatriation of more than $18 million in unreported, offshore income as legitimate stock purchases."[27]  The government described the "extensive" affirmative steps that Mr. Pursley took to hide the fraudulent scheme, including causing the creation of sham companies and fraudulent records. *Id.*  The government also noted that Mr. Pursley refused to accept responsibility or show remorse for his crime, instead "wag[ing] a scorched-earth campaign against the government's trial witnesses." *Id.*  The government sought a prison sentence within the Guideline range of 151-188 months. *Id.* at 2. Instead, the court imposed a sentence of just 24 months.  The instant case stands in stark contrast

---

[24] United States Sentencing Comm'n, 2019 Annual Report & Sourcebook at 64 (2020), *available at* https://www.ussc.gov/research/sourcebook-2019.
[25] *Id.* at 90, 96.
[26] *Id.* at 101.
[27] Ex. G, Gov't Sentencing Memorandum, Dkt. Entry #256 (July 13, 2020), *1, *United States v. Pursley*, No. 4:18-CR-575 (S.D. Tex.).

to the *Pursley* prosecution.  Unlike Mr. Pursley, Mr. Choi cooperated fully in the investigation, accepts full responsibility for his criminal conduct, and is deeply remorseful.  Mr. Choi is surely more deserving of mercy and leniency.

In *United States v. Betancourt*, No. 19-20684-cr-MGC (S.D. Fla. Mar. 11, 2020), the defendant pleaded guilty to one count of violating 26 U.S.C. § 7202 and admitted to causing a tax loss of nearly $11 million.  In its sentencing memorandum,[28] the government alleged an extended pattern of failing to pay employment taxes dating back to 2002. *Id.* at 6 ("[T]he long history of failing to pay employment taxes heightens his culpability.").  Mr. Betancourt also failed to file any personal income tax returns or pay any personal income tax since 2009. Despite a Guidelines range of 46-57 months, the court sentenced Mr. Betancourt to 24 months incarceration.  Given Mr. Choi's significantly less egregious circumstances and this Court's discretion to impose a sentence that reflects Mr. Choi's good works and medical susceptibility, a more substantial downward variance is warranted.

Similar downward variances have been granted in cases in the District of Maryland. In *United States v. Paper,* No. 8:13-cr-00599-RWT (D. Md. Mar. 11, 2014), a local dentist pled guilty to one count of making and subscribing to a false tax return in violation of 26 U.S.C. § 7206(1).  Facing an advisory Guideline range of 18 to 24 months, the court sentenced Dr. Paper to 3 years' probation, 12 months' home detention and 250 hours of community service providing pro bono dental care.

Another example can be found in in *United States v. Venuti,* No. 10-00235-WMN (D. Md. Nov. 2, 2010).  Prior to joining the global accounting firm of KPMG as a principal and tax

---

[28] Ex. H, Gov't Sentencing Memorandum, Dkt. Entry #19 (Mar. 5, 2020), *United States v. Betancourt*, No. 19-20684-cr-MGC (S.D. Fla.).

consultant, John Venuti worked for the Internal Revenue Service from 1974 to 1983, including a period during which he served as Division Chief of the Tax Treaty and Technical Services Division. His gross income for 2001 through 2006 exceeded $3.5 million, and the tax due over that same period was approximately $800,000. Mr. Venuti pled guilty to three counts of willful failure to file tax returns in violation of 26 U.S.C. § 7203 and acknowledged seven years of unfiled returns with a tax loss of approximately $800,000. The court sentenced Mr. Venuti to three years' probation, with 6 months of home detention and 400 hours of community service.

Although Mr. Venuti made significant commitments to charity, which mitigated the perceived severity of his conduct, Mr. Choi's charitable efforts in this case are much more substantial and are represented by his time and efforts, not just his checkbook. If Mr. Venuti's efforts in the community were sufficient to justify a sentence without incarceration, despite his expertise as a tax professional, prior employment with the Internal Revenue Service, and more extensive illegal conduct, then one is hard pressed to understand the imposition of a more severe sentence on Mr. Choi under the spirit of 18 U.S.C. § 3553(a)(6).

Finally, recent cases in the District of Columbia also illustrate the trend towards below Guidelines sentences for similar offenders. *See e.g.*, *United States v. Sickle*, No. 17-cr-00073 (KBJ) (D.D.C. Aug. 1, 2017) (court varied downward from Guideline range of 24-30 months to 7 months); *United States v. King*, 201 F. Supp. 3d 167, 168 (D.D.C. 2016) (court varied downward in case involving fraudulent tax return conspiracy from Guidelines range of 10-16 months to 3 years' probation); *United States v. Revell*, No. 13-cr-00317 (KBJ) (D.D.C. Mar. 25, 2014) (court varied downward in case from Guideline range of 12-18 months to 3 years' probation).

## THE IMPACT OF COVID-19

It is impossible to assess Mr. Choi's sentence without addressing the dire public health situation in our nation's federal prison system. Our society and criminal justice system are operating in a uniquely dangerous moment, as COVID-19 continues to sweep through the nation and its prisons. At least 122 federal inmates have died of COVID-19,[29] and there are currently *confirmed* active COVID-19 cases at 117 separate BOP facilities.[30] The COVID-19 case rate in prison populations was recently registered at 5.5 times higher than in the general U.S. population, despite BOP facilities' well-documented difficulties in instituting extensive testing. *See, e.g.*, *United States v. Day*, No. 6:18-CR-06015 EAW, 2020 WL 4196357, at *3 (W.D.N.Y. July 21, 2020) ("Indeed, administering only eight tests among the inmate population [at FCP Pensacola] seems shockingly low."); *United States v. Croft*, No. 95-496-1 (JRP), 2020 WL 3871313, at *2 (E.D. Pa. July 9, 2020) ("[A]s the Government admits, FCI Schuylkill has not implemented widespread testing for the virus, so we cannot be certain of the true spread of infection at the prison."); *United States v. DeBartolo*, No. 14-cr-016 (WES), 2020 WL 3105032, at *2 (D.R.I. June 11, 2020) ("While no general population inmates have tested positive at the low security facility [FCI Fort Dix] the BOP has also not performed widespread testing that would allow the Court to determine the actual infection rate.").[31] In many states, the pandemic

---

[29] The names of 120 of the federal inmates confirmed to have died from COVID-19 are recorded here, along with brief descriptions of their lives. University of Iowa Law School, Federal Criminal Defense Clinic, *They Are Human Too: 120 Federal Inmate Deaths, An Incalculable Loss*, *available at* https://law.uiowa.edu/compassionate-release-work (last visited Sep. 23, 2020).
[30] Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/ (last visited Sep. 23, 2020)
[31] Brendan Saloner, et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, Journal of the American Medical Association, (July 8, 2020), *available at* https://jamanetwork.com/journals/jama/fullarticle/2768249.

has continued to rage unabated; in a particularly horrifying recent development, a federal prison

in Texas recently registered a 60% COVID-19 infection rate among its 1,798 inmates.[32]

On March 26, 2020, Attorney General William Barr issued a memo to the BOP, stating

that "at-risk inmates who are non-violent and pose minimal likelihood of recidivism" are likely

"safer serving sentences in home confinement rather than in BOP facilities."[33] The Attorney

General recommended that BOP "ensure that home confinement is utilized, where appropriate, to

protect the health and safety of BOP personnel and the people in our custody."  Since the

Attorney General's recommendation, the BOP has placed 7,645 federal inmates in home

confinement.[34] The Attorney General's action recognized an obvious truth: that prisons are

"powder kegs for infection," putting inmates and correctional staff at disproportionately high risk

of contracting COVID-19. *United States v. Skelos*, No. 15-cr-317 (KMW), 2020 WL 1847558, at

*1 (S.D.N.Y. Apr. 12, 2020).

The Center for Disease Control's ("CDC") recommendations for preventing COVID-19

transmission, such as spending time outdoors, distancing from others, and disinfecting frequently

touched surfaces, are incompatible with prison facilities and procedures. *See id; see also United*

*States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020)

("[I]nmates live in close quarters, share one large bathroom with only a handful of stalls and

showers, and eat elbow-to-elbow at three-foot wide tables in the dining hall. . . . Such conditions

---

[32] Alicia Victoria Lozano, 1,000 Federal Inmates at Texas Prison Test Positive for COVID-19, NBC News (July 17, 2020), *available at* https://www.nbcnews.com/news/us-news/1-000-federal-inmates-texas-prison-test-positive-covid-19-n1234256

[33] U.S. Attorney General, *Memorandum to Director of Bureau of Prisons re Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

[34] Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/ (last visited Sep. 22, 2020).

make controlling the spread of COVID-19 more challenging and the risk to vulnerable inmates . .

. that much greater")*.* BOP is "ill equipped to prevent the spread of COVID-19" and has

struggled to provide sufficient personal protective equipment ("PPE") to minimize inmates' and

correctional staffs' exposure to the virus. *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1,

2020 WL 1627331, at *8 (E.D. Pa. Apr. 1, 2020).[35]  Nor are federal prisons sufficiently self-

contained to prevent new outbreaks, as "guards and newly arrested individuals must enter the

facility on a daily basis." *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at

*1 (D. Mass. Mar. 26, 2020). And finally, federal prisons do not have the staffing, expertise, or

specialized ventilator equipment to adequately care for vulnerable inmates once they contract

COVID-19 and need swift medical attention.[36]

 Closer to home, this Court has recognized the perilous public health situation in the D.C.

Department of Corrections ("DOC"). *See United States v. Johnson*, No. 15-cr-125 (KBJ), 2020

WL 3041923, at *10 (D.D.C. May 16, 2020) (citing *Banks v. Booth*, No. 20-cv-849 (CKK), 2020

WL 1914896, at *6-7 (D.D.C. Apr. 19, 2020)). The DOC has since continued to struggle with

implementing appropriate prevention and treatment policies, with a *confirmed* infection rate of

---

[35] *See* Keri Blakinger & Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, The Marshall Project (June 18, 2020), *available at* https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps.

[36] U.S. Dep't of Just., Off. of the Inspector Gen., Report: *Top Management and Performance Challenges Facing the Department of Justice – 2019*, 4 (Oct. 18, 2019), *available at* https://oig.justice.gov/sites/default/files/reports/2019.pdf ("Nationwide provider shortages, the BOP's inability to provide competitive compensation to providers, and the BOP's rural facility locations each contribute to these difficulties [in staffing healthcare provider positions]. In addition to the problems of recruiting and retaining qualified healthcare professionals, providing adequate healthcare to inmates remains a challenge for the BOP."); *see also* Joseph Neff & Beth Schwartzapfel, *Infected, Incarcerated – and Coming to an ICU Near You?*, The Marshall Project (Apr. 16, 2020), *available at* https://www.themarshallproject.org/2020/04/16/infected-incarcerated-and-coming-to-an-icu-near-you (observing that prisons' lack of ventilators is leading to emergency medical transfers of inmates to already-overwhelmed local hospitals).

13.5% registered on May 15, 2020 – nearly 14 times higher than the rate for other D.C. residents. *Banks v. Booth*, No. 20-cv-849 (CKK), 2020 WL 3303006, at *6 (D.D.C. June 18, 2020) (granting in part inmates' motion for a preliminary injunction against DOC).

Similarly, numerous BOP facilities are still struggling to adapt their procedures and prevent pervasive spread of COVID-19. *See, e.g.*, *Wilson v. Williams*, 961 F.3d 829, 845 (6th Cir. 2020) (Cole, C.J.) (concurring & dissenting in part) (recognizing that FCI Elkton had become "an epicenter of the pandemic within the federal prison system" with inmates "exceptionally exposed" to COVID-19); *Torres v. Milusnic*, No. 20-cv-4450 (CBM), 2020 WL 4197285, at *8 (C.D. Cal. July 14, 2020) (finding that physical configuration of facilities at FCI & USP Lompoc "preclude[d] meaningful social distancing" and granting inmates' motion for preliminary injunction).

Aside from COVID-19-caused fatalities, much is still unknown about the virus's long-term effects on infected patients, with research suggesting ongoing risks of permanent lung damage, strokes and embolisms, heart damage, and neurological injury.[37] While the CDC has identified several health conditions that make an individual especially vulnerable to COVID-19, that list is by no means exhaustive nor dispositive of an individual's susceptibility. A sister court in this district recently recognized this in the context of a compassionate release motion:

> The government . . .  [is] essentially arguing that the CDC's identification of a condition as high risk is a condition precedent for finding that COVID-19 increases a particular inmate's risk. But while the CDC's guidance is material, it is not the only source of information about COVID-19. Especially given the novelty of the COVID-19 virus, the rapidly evolving and everchanging understanding of how it works and who is most at risk, and the serious complications, including death, that can result, it, at best, makes no sense and would be fundamentally

---

[37] Lois Parshley, *The Emerging Long-Term Complications of COVID-19, Explained*, Vox (June 12, 2020), *available at* https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms (summarizing research).

unfair, if not contrary to the statute, to slam the compassionate release door on
any inmate whose medical condition does not appear on the CDC's list.

*United States v. Powell*, No. 05-cr-0061 (ESH), 2020 WL 4578682, at *3 (D.D.C. June 18,

2020).

Here, preliminary scientific research suggests that high cholesterol levels are a significant

risk factor for COVID-19 infection.[38] Health experts and psychologists also have observed that

COVID-19 has had a severe impact on Americans' mental health due to social isolation and

heightened anxiety.[39] Such issues are even more debilitating for prisoners, who already suffer at

high rates from often-untreated metal illnesses or other mental health problems.[40] Courts have

increasingly recognized that such mental health conditions "cause stress, which impairs the

immune system against viral infections, such as COVID-19." *United States v. Rodriguez*, No.

3:17-cr-4477 (BTM), 2020 WL 4592833, at *3 (S.D. Cal. Aug. 5, 2020); *Doe v. Barr*, No. 20-cv-

02141 (LB), 2020 WL 1820667, at *4 (N.D. Cal. Apr. 12, 2020) ("Growing evidence

demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response

---

[38] Dr. Liji Thomas, *Does Cholesterol Play a Role in COVID-19?,* News Medical (May 12, 2020), *available at* https://www.news-medical.net/news/20200512/Does-cholesterol-play-a-role-in-COVID-19.aspx ("Based on these findings, the researchers propose that cholesterol is essential for SARS-CoV-2 infection. Low cholesterol levels provide few entry points, and reduce their size, as in children. However, with aging, higher cholesterol levels cause the number and size of entry points, accounting for the much higher likelihood of infection."); *see also* Hao Wang et al., *The Role of High Cholesterol in Age-Related COVID19 Lethality*, (May 10, 2020), *available at* https://www.biorxiv.org/content/10.1101/2020.05.09.086249v2 (last visited Sep. 22, 2020).
[39] Amy Woodyatt, *Experts Warn of Urgent Need for COVID-19 Mental Health Research*, CNN (Apr. 15, 2020), *available at* https://www.cnn.com/2020/04/15/health/covid-19-mental-health-pandemic-wellness-intl-scli-gbr/index.html.
[40] *See* Alexandra Brewis & Amber Wutich, *COVID-19 Is Harming Mental Health in Prisons*, Psychology Today (June 2, 2020), *available at* https://www.psychologytoday.com/us/blog/diagnosis-human/202006/covid-19-is-harming-mental-health-in-prisons; *see also* Christine Thompson & Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project (Nov. 21, 2018), *available at* https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons.

and increased risk of infections . . . weakened immunity due to mental-health disorders can put detainees at increased risk of contracting and suffering from more severe forms of COVID-19.").

At nearly 59 years old, Mr. Choi is in a high-risk demographic if he contracts COVID-19.[41]  The CDC has found that the rate of hospitalization for a severe COVID-19 infection increases with age, with "people in their 50s [being] at higher risk for severe illness than people in their 40s."[42] Mr. Choi's high cholesterol levels also likely place him at increased risk of contracting COVID-19 in the first instance. Even leaving aside its short-term peril for Mr. Choi, COVID-19 may well induce serious long-term medical complications that could degrade Mr. Choi's quality of life and shorten his lifespan, such as respiratory ailments, neurological injuries, and heart damage.  Finally, as described above, Mr. Choi also suffers from clinical depression and generalized anxiety disorder, conditions which will almost certainly be profoundly aggravated by any sustained COVID-19 lockdown or isolation protocol in a BOP facility. *See Johnson*, 2020 WL 3041923, at *10 (observing that mental illness and the stress of detention may make already medically vulnerable defendant more susceptible to COVID-19) (citing *Doe*, 2020 WL 1820667, at *4); *see also United States v. Galaz*, No. 15-cr-02559 (GPC), 2020 WL 4569125, at *5 (C.D. Cal. Aug. 12, 2020) (finding defendant's diagnosed depression "make her release request especially compelling" because the "impact of COVID-19 is particularly severe for individuals suffering from depression"). Mr. Choi's mental health conditions will likely

---

[41] World Health Org., Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), 12 (Feb. 28, 2020), *available at* https://www.who.int/docs/defaultsource/coronaviruse/who- china-joint-mission-on-covid-19-final-report.pdf. (finding a mortality rate of 1.3% among those aged 50-59).

[42] Center for Disease Control, *COVID-19 & Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Sep. 23, 2020) (finding 136.1 hospitalizations for COVID-19 per 100,000 of population in the 50-64 year-old age bracket).

inhibit a vigorous immune system response to any viral infection, making him especially vulnerable to COVID-19.

Because Mr. Choi's age, physical and mental health characteristics make him particularly susceptible to COVID-19, the current pandemic conditions in the prison system are material to the U.S.S.G. and § 3553(a) analysis here and weigh strongly in favor of a non-incarcerative sentence. *United States v. Jackson*, No. 19-cr-00492 (RA), 2020 WL 2759601, at *2 (S.D.N.Y. May 26, 2020) ("Courts are empowered to consider health conditions as part of, and in conjunction with, the traditional sentencing factors described in § 3553(a)").

Mr. Choi's tax crime is serious. He acknowledges his guilt, is extremely remorseful, and accepts full responsibility for his conduct.  He deeply regrets the harm he has caused to the Government, his employees, his family, and others who count on him to serve as a role model and mentor.  He will spend the rest of his life making amends and recognizes that punishment is appropriate.  Yet a sentence of incarceration that subjects him to high risk of physical and mental health complications and death exceeds the bounds of what is fair and just. *United States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880, at *6 (S.D.N.Y. Apr. 3, 2020) (finding tax evasion defendant's conduct egregious but observing that the court "did not intend for [his] sentence to include incurring a great and unforeseen risk of severe illness or death") (internal quotations omitted). For a medically at-risk, non-violent, first time offender like Mr. Choi, a sentence of incarceration during a deadly pandemic is surely greater than necessary.

## **CONCLUSION**

"[S]entencing decisions represent instances in which the whole sometimes can be greater than the sum of the constituent parts." *United States v. Martin,* 520 F.3d 87, 95 (1st Cir. 2008). Here, the combination of Mr. Choi's compliance since early 2016, acceptance of responsibility,

early cooperation, close family ties, extensive contributions to his community, and the sentences imposed on similarly situated defendants counsel for a variance sentence of time served and supervised release with the conditions of substantial home detention and community service.  To incarcerate Mr. Choi based on the relevant facts and circumstances, and in the midst of this global health crisis, would not advance the purposes of our criminal sentencing system.

Based on the facts and circumstances of this case, and considering Mr. Choi as an individual who has spent his life caring for others, the proposed sentence would be sufficient, but not greater than necessary.


                                        Respectfully submitted,

September 24, 2020                       */s/ Caroline D. Ciraolo*
                                        Caroline D. Ciraolo
                                        Bar No. 453882
                                        Kostelanetz & Fink, LLP
                                        601 New Jersey Ave., NW
                                        Suite 260
                                        Washington, D.C. 20001
                                        cciraolo@kflaw.com
                                        Phone: (443) 845-4898
                                        Facsimile: (212) 808-8108
                                        *Counsel for Steve Choi*


                        **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 24, 2020, I filed the foregoing Sentencing Memorandum via ECF, causing service to be made upon counsel of record.


                                        */s/ Caroline D. Ciraolo*

                                        Caroline D. Ciraolo