## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 20-CR-0006 (KBJ)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **STEVE CHOI,** | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING REPLY MEMORANDUM

The United States of America, by and through undersigned counsel, hereby respectfully submits its reply memorandum to address some of the points raised in the Defendant's Sentencing Memorandum. As the defendant's various arguments do not justify a variance, the Government respectfully submits that a sentence within the heartland of the guideline range of 46 to 57 months remains appropriate.

1. ***The Defendant Continues to Minimize His Role and Responsibility for the Tax Offense***

Over the course of the Government's investigation, Choi has provided many rationales for his tax scheme. (*See* ECF #21) (Gov't Sentencing Memo. at 5). His brief provides yet another. In it, he deflects responsibility onto his employees, submitting a third-party statement that the defendant "believed and trusted the management team to take care of everything." (ECF #23) (Def. Sentencing Memo. at 19). He then further rationalizes his conduct by claiming he "opted to expand to new locations in the belief that the solution lay simply in additional gross receipts." (ECF #23) (Def. Sentencing Memo. at 19). The two statements are at odds with each other—how can the "management team" be responsible if Choi was the one deciding to expand the business?

Leaving this inconsistency aside, however, neither statement is supported by the facts or logic. Choi was integrally involved in all aspects of his business; he was described by employees

as a "micromanager," particularly with respect to its finances; and he was repeatedly advised, as he has admitted, by both his staff and the IRS as to his tax failings. (*See* ECF #21) (Gov't Sentencing Memo. at 4-6). This is the not case of an owner asleep-at-the-wheel but rather of a highly accomplished businessman taking a calculated risk that he would face no meaningful consequences for misappropriating millions of dollars in taxes.

Choi attempts to spin his corrupt endeavor as motivated by the best of intentions, namely by stating that he was trying to grow his way out of his troubles by expanding "gross receipts." Not only is that statement at odds with the previous rationales provided to the IRS (*see* ECF #21) (Gov't Sentencing Memo. at 5), but it is unconnected to his actual tax obligations. Employment taxes, particularly the employee portion, are collected in "trust" from an employee's salary and then remitted to the IRS. There is no connection, conceptual or otherwise, to gross receipts because the money he withheld was not his. Similarly, sales taxes are collected from customers and then required to be paid to the Office of Tax and Revenue. Again, there is need to grow gross receipts to be sales tax compliant—all that an employer need do is pay what he collected. This is plainly not what happened here. Choi simply continued to collect money that he then failed to remit.

Even more galling is Choi's later suggestion that he deserves credit for his "past employment of thousands of D.C.-area residents [as it] demonstrate[s] that 'society will be best served' by allowing him to 'continue his good works. . .'" (ECF #23) (Def. Sentencing Memo. at 21). Choi stole money that these same workers entrusted him to pay over for their Social Security and Medicare benefits, just as he stole money that customers entrusted him to pay over in sales tax. He did so knowingly, willfully, and repeatedly. His entire business model and practice was permeated by these frauds. His failure to recognize the seriousness of his crimes and his blithe suggestion that he should be released to home confinement so that he can "continue his good

works" is ultimately an argument that his tax crimes do not matter because they were committed during his operation of a business that employs people.

Similarly misguided is his repeated assertion that he should get credit for "pre-sentence rehabilitation." (ECF #23) (Def. Sentencing Memo. at 23). The defendant pled guilty in the instant case only after years of governmental enforcement action and several additional years of IRS effort to unwind his complex web of businesses and their intertwined finances. The defendant's ongoing rationalizations and minimizations reflect the true extent of his acceptance of responsibility, as does the massive, outstanding tax loss.

Nearly five years have passed since Choi wound down his employment and sales tax schemes. During that intervening period, Choi has received millions in salary, income, and distributions. Choi reported on his Schedules E earning from his various food service businesses over $1 million in 2016, nearly $700,000 in 2017, approximately $384,000 in 2018, and another $311,000 in 2019. These funds were in addition to Choi's wages and salaries, which were at least $143,000 for each year. This was money that could have been directed to his fraud victims. Yet, despite the passage of nearly half-a-decade, the IRS and OTR have not been made even remotely whole. In fact, Choi has only paid back $19,039 (or .005%) of the more than $4 million that he owes just in employment taxes, and given Choi's supposed debarment from some of his contracts, it is highly questionable whether the Government will ever be paid in full. (ECF #23) (Def. Sentencing Memo. at 3, fn. 2). Under these circumstances, a sentence of home confinement would send the wrong message to other would-be tax cheats, particularly given the size and scope of the defendant's fraud.

2. ***Charitable Works Financed with Proceeds from Tax Crimes Do Not Justify a Variance***

The defendant has provided the Court with a variety of letters attesting to his good deeds and positive characteristics, particularly his generosity. The defendant's generosity appears to have been funded, at least in part, by his tax crimes. In 2010 and 2011, as he began to accrue his various tax liabilities, the defendant directed nearly $270,000 to his church. During the heart of his tax crimes, the defendant directed even more: approximately $222,000 in 2012; $108,000 in 2013; $231,000 in 2014; and $136,000 in 2015. At the same time that Choi was making these substantial donations to his Church, from 2013 to 2015, he was reporting $0 in taxable income on his individual tax returns.[1] Even after he stopped misappropriating employment and sales taxes as they became due, he continued to donate to the Church, often from corporate accounts, in lieu of paying back the money that he taken. For example, in 2016, Choi directed another $154,000 to his church, at a time when he owed over $4 million in employment taxes and $6 million in sales taxes. It would be perverse for Choi to receive a lesser prison sentence for generosity that was financed with the apparent proceeds of his tax crimes.

Even were the defendant's charity not funded by tax crimes, the defendant's positive qualities do not distinguish him from the typical white-collar defendant. As Judge Marrero in the Southern District of New York observed in another white collar case, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

---

[1] Choi accomplished this remarkable feat by claiming massive offsetting losses on his personal individual income tax returns, approximately $445,000 in losses for 2013, $472,000 in losses for 2014, and $449,000 in losses for 2015. (*See* ECF #25, Ex. 12) (Gov't Sentencing Exhibits).

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010). Other courts have similarly found that "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003); *United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts . . Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card.").

The defendant notes that some courts have granted downward variances on the basis of good works, but these cases are not analogous. For example, in *United States v. Adelson*, which the defendant cites and discusses extensively, the court gave the defendant credit for his charitable acts as "[m]ost of them were unknown to all but a few people until the time of his sentencing" and "the defendants 'good deeds were not performed to gain status or enhance his image.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008). By contrast, the defendant's generosity here appears to have been largely public facing, and was financed, in no small measure, if not entirely, by his crimes. Even after committing his offenses, the defendant continued to make donations that would enhance his community reputation rather than making his victims whole. Perhaps, most telling of all, notwithstanding the *Adelson* court's determination of the defendant's remarkable deeds and minimal comparative culpability, it still sentenced him to 42 months imprisonment.[2]

---

[2] *Adelson* is also distinguishable because Judge Rakoff, in explaining his rationale for a downward variance, noted that the defendant "only joined the [accounting] conspiracy toward its end," and
(continued...)

In short, Choi's charitable acts do not set him apart from other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of themselves, as Choi did, from their family, friends, and colleagues. And it certainly does not justify the variance requested by the defendant.

3. ***Home Confinement Is Insufficient to Provide a Deterrent Effect or Just Punishment***

The Guidelines make clear that general deterrence is a critical component of white collar, and specifically tax, sentences. *See* U.S.S.G. § 2T1, introductory cmt. (2016). The defendant contests this basic proposition. However, the cases and authorities that he references in support of his position actually undercut his argument. For example, the defendant discusses *United States v. Courtney*, but wrongly claims that the district court judge, Judge Browning, concluded the theory of general deterrence "does not work in the real world."[3] (ECF #23) (Def. Sentencing Memo. at 26). This is, in fact, the opposite of the district court's conclusion. As Judge Browning explained in ordering a guideline sentence, "[t]he Court assumes—and it must make this assumption under § 3553(a)(2)(B)'s general-deterrence consideration—that harsher sentencing will, at least to some extent, result in fewer new offenders committing a crime." After an extended discussion of the relevant statistical literature, the Court then concluded,

> What is clear, however, is that severity of punishment *continues to have some deterrent effec*t—albeit less than it would were the universe of potential criminals

---

that his co-conspirators, "who actually designed the fraud[,] entered into cooperation agreements with the Government, in return for which they became eligible for the substantially reduced sentences that they ultimately received." *Adelson*, 441 F. Supp. 2d at 507. Compare that to the present case, where the defendant was aware of the fraud from nearly its inception, repeatedly directed it to continue, and was its principle beneficiary.

[3] The aspect that Judge Browning did not believe applied in the real world was an *academic model*—not the theory of general deterrence. 76 F. Supp. 3d 1267, 1306 at fn. 13. (D.N.M. 2014).

(continued...)

> an overall rational bunch. . . . It also seems *likely that the behavior of sophisticated potential criminals would hew more closely to the economic model* than that of unsophisticated, street—level criminals. Thus, *general deterrence remains an important consideration in cases like this one, in which the perpetrators are relatively sophisticated* and the certainty of detection relatively low—and the celerity even lower.

*United States v. Courtney*, 76 F. Supp. 3d 1267, 1306 at fn. 13. (D.N.M. 2014) (emphasis added).[4]

The central importance of general deterrence, particularly in a white-collar context, has also been repeatedly affirmed by the D.C. Circuit. *See, e.g.*, *United States v. Saani*, 794 F.3d 44, 48-49 (D.C. Cir. 2015) (upholding upward variance and sentence of 110 months, where defendant had $2.4 million in unreported income, on the basis of "the need to deter tax evasion by persons entrusted with the expenditure of federal funds."); *United States v. Anderson*, 545 F.3d 1072, 1077 (D.C. Cir. 2008) (upholding upward variance in tax case "[c]onsidering the magnitude of [the defendant's] crimes and the need for deterrence.").

At its most basic, the defendant is arguing that his restitution assessment, the loss of his contracts, and home confinement is sufficient punishment for his crimes. The "staggeringly large" restitution figure, which the defendant seemingly laments, merely reflects the enormity of his crime. (ECF #23) (Def. Sentencing Memo. at 30). Moreover, restitution is not punitive in nature. Choi is simply required to pay the Government what he owed in the first instance if he had never committed his offense. Additionally, as Choi himself appears to concede, it is unlikely the

---

[4] Two year later in *United States v. Sandoval-Enrique*, Judge Browning again reiterated the critical importance of general deterrence and provided an extended analysis of the relevant sociological and statistical literature discussing general deterrence. 171 F.Supp.3d 1190 (D.N.M. 2016). The case involved a recidivist illegal reentry offender, who, like the present defendant, argued that the "Court should not consider deterrence at all" because of its supposed inefficacy and that he should be released to time served. *Id.* at 1210. Judge Browning squarely rejected the proposition. He noted, in sentencing the defendant to 16-months imprisonment, that the Court had "on multiple occasions, determin[ed] that the severity of punishment continues to have some deterrent effect— albeit less than it would were the universe of potential criminals an overall rational bunch." *Id.* at 1210.

Government will ever be fully paid back given the loss of the defendant's business contracts, which was an imminently foreseeable event caused by his conduct. *See e.g.*, *United States v. Cutler,* 520 F.3d 136, 170 (2d Cir. 2008) (rejecting a district court's argument that public humiliation, the loss of a law license, and the certainty of prosecution were sufficient to accomplish deterrence in the general sense, stating "[a]s a matter of law and reason, we cannot agree."). Thus, once reduced to its most basic, it is apparent that Choi is making an extraordinary request: that he be sentenced simply to home confinement despite defrauding the Government out of $10 million, much of which he pocketed. This request runs counter to the Guidelines, counter to the case law, and counter to common sense. As such, the Court should reject it and send a message to all taxpayers that they must follow the law.

4. ***The Defendant's Age and the Covid-19 Pandemic Is Not a Basis for a Non-Incarceratory Sentence***

The defendant next argues that he should be sentenced to home confinement because of his age and the COVID-19 outbreak. Neither argument is persuasive. Choi is only 57 years old. Substantially older defendants regularly receive far longer terms of incarceration than the defendant faces here. *See, e.g.*, *United States v. Von Der Goltz*, 1:18-cr-00693 (S.D.N.Y. Sept. 2020) (four-year sentence for 83-year old, who committed $3.4 million tax offense); *United States v. Sharpton*, 18-cr-20289 (S.D. FL March 2019) (61 year-old defendant, who pled guilty to $1.3 million tax fraud, sentenced to guideline sentence of 39 months); *United States v. Heard*, 709 F.3d 413, 435 (5th Cir. 2013) (affirming guideline sentence of 51 months for 65 year-old defendant convicted of $2.4 million employment tax fraud). Furthermore, this case fits the pattern that corporate executive defendants tend to be disproportionately older, due to the need for greater education, training, and life experience necessary to reach the point where they have the opportunity to defraud others out of millions of dollars. Indeed, it would be a perverse result for a

defendant to successfully evade criminal prosecution for years, reap the benefit of those crimes until old age, and then cite his old age as a reason to escape incarceration altogether.

Finally, neither the defendant's age nor his medical conditions place him at disproportionately high risk for COVID-19. PSR § 46-49; CDC, "People at Increased Risk of Severe Illness," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html. According to the latest available statistics from the CDC, individuals 55-64 years old have had a nearly identical COVID-19 mortality rate (0.057%) than the population as a whole (0.058%).[5] The CDC does not list either high cholesterol or depression as a cause of increased risk for severe illness from COVID-19.[6] In short, there is no basis to conclude that the defendant bears a substantially disproportionate risk from COVID-19 based on his age and health.

---

[5] Calculation based on 23,991 COVID-related deaths for 55-64 year olds, out of 42,272,636 total 55-64 year-old Americans (0.057%), as compared to 188,470 total COVID-related deaths out of 327,167,434 total Americans (0.058%). *Available at*, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex.

[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. While it appears, as of the time of this writing, that COVID-19 conditions have improved in the federal prison system, it is unknown what conditions will be in the United States generally, and in the federal prisons in particular, if the defendant is provided with a surrender date weeks or months after sentencing. The Government has consented to extensions of surrender dates for other defendants in recent months, and acknowledges that it may be appropriate to adjust surrender dates based on changes in COVID-19 conditions. The Government is able to provide additional briefing on conditions in specific prisons and on the extensive steps taken by the Bureau of Prisons to mitigate COVID-19.

## CONCLUSION

Tax fraud is not a victimless crime. Every dollar wrongfully taken from the United States and the District of Columbia has real consequences. It impacts the Government's basic ability to provide core services. Equally important, it perniciously erodes our society's culture of compliance—the perception held by the average citizen that paying taxes is a fundamental part of the mutual obligation that we hold for each other and that there are real consequences to evading this responsibility. The defendant repeatedly and extensively violated this basic trust. He stole over $10 million. He did so for self-gain. There must be meaningful consequences for such actions, and that is why the United States respectfully submits that a period of incarceration within the guideline range of 46 to 57 months is necessary and proper.

DATED:        October 1, 2020

                              Respectfully Submitted,

                              MICHAEL R. SHERWIN
                              Acting United States Attorney
                              District of Columbia


                    By:      _____/s/_____
                              Jack Morgan, Trial Attorney
                              Jack.A.Morgan@usdoj.gov
                              Eric Schmale, Trial Attorney
                              Eric.C.Schmale@tax.USDOJ.gov
                              (202) 514-7036/5614
                              Veronica Sanchez, AUSA
                              VSanchez@usa.doj.gov
                              202-252-7518
                              Department of Justice Tax Division
                              150 M Street NE
                              Room 1.116
                              Washington, DC 20002

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 20-CR-0006 (KBJ)** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **STEVE CHOI** | : | |
| **Defendant.** | : | |

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

By:   <u>/s/ Eric Schmale</u>
Jack Morgan, Trial Attorney
Jack.A.Morgan@usdoj.gov
202-353-7580
Eric Schmale, Trial Attorney
Eric.C.Schmale@tax.USDOJ.gov
(202) 514-5614
Veronica Sanchez, AUSA
VSanchez@usa.doj.gov
202-252-7518
Department of Justice Tax Division
150 M Street NE
Room 1.116
Washington, DC 20002