# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Case No. 1:20-cr-00006 (KBJ)** |
| **STEVE CHOI** | * | |

## DEFENDANT'S REPLY TO
## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

October 1, 2020

Caroline D. Ciraolo
Fed. Bar No. 453882
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW
Suite 260
Washington, D.C. 20001
cciraolo@kflaw.com
*Counsel for Steve Choi*

## INTRODUCTION

Steve Choi will appear before the Court on October 8, 2020 for sentencing, having pled guilty and accepted full responsibility for his criminal conduct.  As set forth in his Sentencing Memorandum filed on October 1, 2020, and based on the factors set forth in 18 U.S.C. § 3553(a) and the impact of the COVID-19 pandemic that has resulted in more than 34 million total cases and more than 1 million deaths worldwide, Mr. Choi seeks a sentence of time served and supervised release, with conditions of home confinement and substantial community service. The Government seeks a sentence of incarceration ranging from 46 to 57 months.  Mr. Choi files this Reply to address several of the points raised in the Government's sentencing memorandum.

## The Nature of Mr. Choi's Offense

In its Sentencing Memorandum, the Government goes to great lengths to portray Mr. Choi as the mastermind of a "highly calculated and planned . . . scheme," Government Sentencing Memorandum ("Gov't Memo."), at 14, even leveling accusations above and beyond the true facts and circumstances of this case.  The Government also suggests that Mr. Choi has not taken full responsibility for his criminal conduct. *See* Govt's Reply, at 1 (citing a letter written by Matthew Yoo). This is simply false.  Mr. Choi has cooperated with the Government at every stage of its civil and criminal investigation.  He has always taken, and continues to take, full responsibility for his conduct.  Mr. Choi's request for a downward variance is not at odds with these facts, and is supported by the factors set forth in 18 U.S.C. § 3553(a).

Mr. Choi willfully failed to collect, account for, and pay over employment tax.  He did not set out to steal money from the Government or orchestrate a complex scheme to evade his tax obligations.  He did not embezzle from his companies, hinder collections, or seek to gain a

competitive business advantage.  When I.L. Creations fell behind on its tax obligations,[1] Mr.

Choi cooperated with the Government's investigation of the liabilities. Govt's Memo., Ex. 3

(Interview of Revenue Officer McPherson); Ex. 5 (ICS History Transcript, identified as p. 36),

but failed to do everything he could to rectify the situation and come into compliance. Instead, he

sought to solve the problem by expanding operations, in the hope of generating more revenue to

satisfy the liabilities.  Of course, this faulty and misguided reasoning resulted in greater, not

reduced, liabilities.  The businesses were often operating at a loss due to substantial opening and

operating costs, including, among other expenses, cost of goods sold, labor, insurance, and lease

payments, including those due to the Government each month, for federally-owned locations.[2]

*See* Gov't Memo., Ex. 5 (identified as p. 31).

The Government's need to overreach in this case is puzzling.  Mr. Choi made epically

poor business and financial decisions and knowingly failed to pay over sales and employment tax

due, but did not, as the Government suggests, orchestrate a "highly calculated" plan.  The

Government also states that an accounting employee characterized Mr. Choi as a "micro-

manager". Govt's Memo., at 5.  Yet, the individual in question was a sushi chef, not an

accounting employee, and wrote a character letter on Mr. Choi's behalf. [3]

Again, Mr. Choi accepts full responsibility for his conduct and has done so since his first

contact with the Internal Revenue Service (the "Service").  In fact, it is clear that the Service

considered whether this case involved firm indicia of fraud in 2016, after Mr. Choi brought the

---

[1] The Government notes that while I.L. Creations was formed in 1999, it began accruing tax
liabilities in 2010. Govt's Memo., at 4.

[2] The Government referred to I.L. Creations as a "government contracting empire" and
"government-contracting businesses". Govt's Memo., at 1, 2.  The companies did not receive
funds from the Government; rather, under the lease agreements, I.L. Creations paid a percentage
of sales to the Government as rent for occupying the space.

[3] Mr. Kim writes to this Court urging a merciful sentence for Mr. Choi. *See* Exhibit 1, previously
provided as part of Defendant's Memo., Ex. A at 90-91.

businesses into current compliance, and opted not to pursue a criminal investigation. *See* Govt's Memo., Ex. 5 (ICS History Transcript, identified as p. 174) ("Discussed case with FTA [Fraud Technical Advisor] Larkin"). Instead, the Service opted to pursue a criminal investigation in early 2018, two years after the companies came into current compliance. As noted, Mr. Choi cooperated and pleaded guilty, saving the Government the time and resources in both the investigation and in trial.

Mr. Choi does not have formal training in tax, financial affairs, or accounting. As set forth in his Sentencing Memorandum, he did not do well in school and his true skills lie in the food service side of the business.  Recognizing this weakness, Mr. Choi tried unsuccessfully to solve the company's tax problems by adding individuals with legal, financial, tax, and accounting experience to the accounting department. *See* Gov't Memo., Ex. 6 (Overall Accounting Process); Ex. 7 (Interview of Sun Choi, a staff accountant with I.L. Creations from 2011 to 2017); and Ex. 10 (Interview of Eun Hye Ko, who earned a Master's Degree in Accounting and worked with I.L. Creations from 2009 to 2014). These individuals were not related or beholden to Mr. Choi, and Mr. Choi did not instruct or ask any employee to mischaracterize transactions or take steps to evade the assessment of tax due. *See* Gov't Memo., Ex. 7 (Interview of Sun Choi).

To the contrary, employees in the I.L. Creations accounting department were provided full access to the financial records of the companies.  They were aware of the mounting tax liabilities, prepared updates on the balances due, and received correspondence from the tax authorities. *See* Gov't Memo., Ex. 7 (Interview of Sun Choi); Ex. 10 (Interview of Eun Hye Ko). Accounting personnel were also aware of the business paying Mr. Choi's personal expenses and told to book such personal expenditures to Owner Withdrawals. *See* Gov't Memo., Ex. 7

(Interview of Sun Choi); Ex. 11 (Personal Payments from Businesses).  The books and records of the company, including the ledger accounts to which personal expenses were posted, were disclosed by the accounting department to the companies' accountant to prepare the annual tax returns.  In fact, the corporate return preparer was, at one point, married to an employee in the accounting department. *See* Gov't Memo., Ex. 7 (Interview of Sun Choi).  Such recruiting efforts and full access to books and records are not indicia of a criminal mastermind determined to evade tax obligations.

Similarly, Mr. Choi's misguided belief that he could grow the business to address the growing tax liabilities is evident from his request in 2012 that the D.C. Office of Tax & Revenue replace a tax lien against the companies with a tax lien against his personal assets, which were otherwise unencumbered by the companies' liabilities. Gov't Memo. at 7 ("[D]efendant successfully pleaded that [the lien] be removed from the business and made a personal lien so that it would not endanger his government contracts . . ."); *see also* Gov't Memo., Ex. 9.

To suggest that Mr. Choi simply ignored the mounting tax liabilities also lacks merit.  As noted in one exhibit to the Government's Sentencing Memorandum, Mr. Choi requested updates on the outstanding liabilities and was clearly "stressed out" by the debt. *See* Gov't Memo., Ex. 7 at 4 of 9 (Interview of Sung Choi) ("..Steve Choi asked for an updated report on the accrued employment and sales tax…")("…when she showed Matthew Yoo and Steve Choi the accrued unpaid employment and sales tax reports, they both seem [sic] to be stressed out.").

Mr. Choi's conduct is not indicative of a calculated and scheming individual intent on defrauding the United States.  Instead, his conduct establishes a clear lack of financial acumen, willful mismanagement of company affairs, and a misguided and intentional effort to increase gross receipts to satisfy liabilities, rather than focus on and direct all available revenue to the

outstanding liabilities.  All of this changed in early 2016, when Mr. Choi engaged new advisors

and, working closely with those tax professionals, came into current compliance.  *See* Gov't

Memo., Ex. 5 (identified as p. 176).  Of course, this compliance does not eliminate or excuse Mr.

Choi's criminal conduct in this case, but, at the moment of sentencing, we humbly submit that

these facts warrant a downward variance.

**Mr. Choi's History & Character**

We believe it is important to clarify Mr. Choi's financial condition.  First, during the civil

and criminal investigations, Mr. Choi owned three properties, each of which was encumbered by

tax liens and at various points, listed for sale.  One property was sold October 26, 2018 for

$374,900 and net proceeds in the amount of $104,710.82 were paid to the Internal Revenue

Service. *See* Ex. 2 (Settlement Statement) and Ex. 3 (cancelled check payable to the Internal

Revenue Service).  In its Sentencing Memorandum and again in its Reply, the Government tells

the Court that Mr. Choi has only paid $19,000 toward outstanding federal tax liabilities, *see*

Govt's Memo., at 15, despite the fact that the Service is aware of this substantial payment, as

well as additional amounts obtained by offset.  Again, it is unclear why this information is

withheld from the Court.

Mr. Choi's personal residence is now under contract and anticipated to result in payment

to the Service of net proceeds of approximately $300,000.[4]  The third property is a rental

property with a long-term lease that runs through October 2021.  Mr. Choi has attempted to sell

this property in the past, and will try again when the lease is terminated, at which time all net

proceeds will be remitted to the tax authorities.

---

[4] The contract was finalized after the submission of the Presentence Investigation Report on May 28, 2020.

As the Presentence Investigation Report ("PSR") makes clear, Mr. Choi and his wife have limited monthly income and substantial expenses. PSR at 21, Dkt. No. 19, *United States v. Choi* ("They have a negative monthly cash flow and it appears they have been utilizing their credit cards to cover monthly expenses."). The Government's suggestion that Mr. Choi received millions based on the figures reported on his Schedules E for years 2016 through 2019 reflects a misunderstanding of the impact of flow-through entities. The amounts reflected on Mr. Choi's Schedules E are derived from Schedules K1, which reflect flow through income of the entities, not cash received by the owners of the business. Mr. Choi's inability to satisfy his financial obligations certainly is not due to a lack of desire or intent, but to extremely poor financial decisions over many years. Again, while this does not reduce his culpability, and in fact, will continue to be a tremendous collateral consequence of his criminal conduct, we hope this is taken into consideration at sentencing.

We also feel compelled to challenge Government's characterization of Mr. Choi's contributions to the community over his lifetime. As the many letters submitted on his behalf clearly indicate, Mr. Choi did not engage in good works for public recognition, and the efforts we ask the Court to consider are overwhelmingly in the form of his personal time and sweat equity, not cash donations made by the businesses. In addition, one need only review Mr. Choi's Sentencing Memorandum, the letters in support, and the PSR, to reject the Government's allegation that he had more advantages than most defendants similarly situated. Mr. Choi worked hard, took care of his family and his community, and built a comfortable life, but all that is now lost as a result of his criminal conduct.

In addressing the sentencing factors, the Government initially chose not to address the impact of the current global health crisis, the impact of which goes to Mr. Choi's personal health

characteristics under 18 U.S.C. § 3553(a).  In the 7 days since the parties filed their respective

sentencing memoranda, the Federal Bureau of Prisons ("BOP") confirmed the presence of

COVID-19 cases at two additional BOP facilities and two new inmate deaths due to virus.[5]

Cases are expected to rise[6] and BOP facilities will continue to experience disproportionately

high infection rates. *See United States v. Harrison*, No. 12-CR-0088-01 (ESH), 2020 WL

5702106 at *2 (D.D.C. Sept. 24, 2020) ("Even at institutions where there are relatively few

reported cases to date, that may be only due to the lack of widespread comprehensive testing,

which means that there is the potential for an undetected breakout.").

 In its Reply, the Government insists that Mr. Choi is not at high risk from COVID-19 and

points to data stating that the 55-64 age range has a similar mortality rate to that of the overall

population. *See* Gov't Reply at 9.  Yet the Government ignores the fact that individuals in the 50-

64 age range have nearly double the hospitalization rate of those individuals age 40-49.[7]  With

its myriad and poorly understood negative effects on the lungs, neurological system, and heart,

COVID-19 represents a serious threat to Mr. Choi's long term health and mortality. *See United*

*States v. Johnson*, No. 15-CR-125 (KBJ), 2020 WL 3041923 at *13 (D.D.C. May 16, 2020)

---

[5] Fed. Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus/ (last visited Sep. 30, 2020) (listing 124 inmate deaths and 119 BOP facilities, up from 122 and 117 on September 23, 2020).

[6] Joel Achenbach & Rachel Weiner, *Experts Project Autumn Surge in Coronavirus Cases, With a Peak After Election Day*, Wash. Post (Sep. 5, 2020), *available at* https://www.washingtonpost.com/health/coronavirus-fall-projections-second-wave/2020/09/04/6edb3392-ed61-11ea-99a1-71343d03bc29_story.html.

[7] Center for Disease Control, *COVID-19 & Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Oct. 1, 2020) (finding 136.1 hospitalizations for COVID-19 per 100,000 of population in the 50-64 year-old age bracket).

(granting compassionate release to defendant suffering from high blood pressure, obesity, and PTSD-caused mental health issues).[8]

Finally, the Government takes issue with Mr. Choi's citation to *U.S. v. Courtney,* 76 F.Supp.3d 1267 (D.NM 2014), suggesting that Mr. Choi misrepresents the district court's holding.  Again, this is simply incorrect.  In his Sentencing Memorandum, Mr. Choi addressed the issue of general deterrence:

> In *United States v. Courtney,* 76 F. Supp. 3d 1267 (D.N.M. 2014), the sentencing court considered incarceration for purposes of general deterrence and noted the logic in assuming that a would-be offender would only commit a crime "when the benefit . . . outweighs the product of the likelihood of getting caught and brought to justice . . . multiplied by the detrimental impact of the punishment." *Id.* at 1304 n.13.  Yet, the court opined that this theory "does not work in the real world; it has been falsified by empirical research. The model is dead, and, facts, not theory, killed it. If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate." *Id.* But "[a]n avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world." *Id.*

Defendant's Memo., at 35.  Footnote 13 of the district court's opinion, which analyzes these concepts at length, describes the economic model as:

> [I]ndividuals committing crimes only when the benefit to the individual of committing the crime (*f,* for "fruits") outweighs the product of the likelihood of

---

[8] The government also points to *United States v. von der Goltz*, 1:18-cr-00693 (S.D.N.Y. 2020) for the proposition that older tax defendants have received lengthy terms of incarceration during the pandemic. However, Mr. von der Goltz and Mr. Choi are not similarly situated. For at least 17 years, "Mr. von der Goltz conspired with others to conceal his assets and investments, and the income generated by those assets and investments, from the IRS through fraudulent, deceitful, and dishonest means. … He evaded his tax reporting obligations by setting up a series of shell companies and bank accounts, and hiding his beneficial ownership of the shell companies and bank accounts from the IRS. These shell companies and bank accounts made investments totaling tens of millions of dollars. Von der Goltz was assisted in this scheme through the use of Mossack Fonseca, including Owens, a Panamanian lawyer who previously worked at Mossack Fonseca, and by Gaffey, a partner at a U.S.-based accounting firm." *See* Press Release issued September 21, 2020, U.S. Department of Justice, Exhibit 4.

getting caught and brought to justice (*c,* for "certainty") multiplied by the detrimental impact of the punishment on the individual (*s,* for "severity").

*Courtney, supra,* at n.13.  The Court goes on to state that, "[t]he model, however, does not work in the real world; it has been falsified by empirical research." *Id.*  Of greater relevance is the district court's analysis of the various factors it considered to warrant a substantial downward variance of 8 offense levels, despite the court's denial of a reduction for acceptance of responsibility and the application of sentencing enhancements for sophisticated means and aggravated role in the offense. *Id.* at 1302-1308.

## <u>CONCLUSION</u>

Mr. Choi respectfully and humbly asks this Court not to impose a sentence that has a significant likelihood of subjecting him to what could amount to a lifelong battle with the consequences of a COVID-19 infection or death.  Instead, we ask the Court to consider a sentence of time served and supervised release with conditions of home detention and a substantial, full-time community-based service program.

Respectfully submitted,

October 1, 2020

*/s/ Caroline D. Ciraolo*
Caroline D. Ciraolo
Fed. Bar No. 453882
Kostelanetz & Fink, LLP
601 New Jersey Ave., NW
Suite 260
Washington, D.C. 20001
cciraolo@kflaw.com
Phone: (443) 845-4898
Facsimile: (212) 808-8108
*Counsel for Steve Choi*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2020, I filed the foregoing Sentencing Memorandum via ECF, causing service to be made upon counsel of record.

*/s/ Caroline D. Ciraolo*
Caroline D. Ciraolo